JUNE, 1896. 131

State ex rel. Bulkeley et al. *v.* Williams, Treasurer.

STATE EX REL. MORGAN G. BULKELEY ET AL. *vs.* SAMUEL H. WILLIAMS, TREASURER.

First Judicial District, Hartford, May Term, 1896.  ANDREWS, C. J., TORRANCE, FENN, BALDWIN and HAMERSLEY, Js.

The burden of constructing and maintaining highways and bridges is one that the legislature can impose on such territorial subdivisions of the State as it may deem equitable, and transfer from one agency to another, from time to time, as it may judge best for the public interests. There is nothing in the Constitution of this State, or in the principles of natural justice on which it rests, which demands that this burden shall be confined to the town or other territorial division in which the highway or bridge is situated.

The expenses of converting a toll-bridge and causeway into a free public highway and of its maintenance thereafter, including the construction of a new bridge when necessary, may be apportioned between the several towns which have been found to be specially benefited thereby, and such towns may be constituted a highway district for that purpose. It is no valid objection to such legislation that the commissioners in whom the management and control of such highway is vested, and whose requisitions for money the towns are obliged to honor, are chosen by the legislature rather than by the towns.  If an absolute right in the inhabitants of our towns to regulate their town finances and affairs, superior to all legislative control, ever existed, it was certainly not such a right as survived the adoption of our Constitution.

The legislation in question (Public Acts of 1895, Chap. 168, Special Acts of 1895, Chap. 343) was claimed to be void because the commissioners were not required to submit any estimate to the several towns of the amount needed for the ensuing year, before the time for laying the annual town tax.  *Held* that in so far as this objection related to the principal and interest on any bonds issued by the district, it was answered by the Act itself, which expressly required the town to pay annually 25 cents for each thousand dollars of its grand list; and as to the ordinary expenses of maintenance, it was to be presumed that the

commissioners would make such reports to each town before its annual town meeting, as would enable it to lay all taxes necessary to meet its probable expenses for the succeeding year.

The question as to what towns were specially benefited by making the toll-bridge and causeway a free public highway, had been judicially determined in 1889 pursuant to the provisions of Chap. 126 of the Public Acts of 1887; and these same towns were made liable under the legislation of 1895, for the future maintenance of the highway, although the proportion in which each town was thereafter required to contribute, was changed to the advantage of all the towns except Hartford.  *Held* that inasmuch as there had been, and could be, no material change in any of the conditions by which the judicial decree of 1889 had been determined, so far as concerned the group of towns specially benefited, no valid exception could be taken to the provision of the law of 1895 which treated the same towns as still specially benefited.  *Held* also, that since the proportionate amount of special benefits received by one town of the group, as compared with the rest, might vary from time to time, it must be presumed that there was due cause for making the apportionment finally determined upon by the legislature.

Substantially the same burden imposed upon the five towns by the Acts of 1895, had been previously imposed upon them by the Act of 1887; but in 1893 the Act of 1887 was repealed, and the State itself assumed the expense of maintaining the bridge and causeway.  *Held* that the Act of 1893 was a mere gratuitous undertaking, with no element of contract, and gave rise to no vested rights, except such as might have accrued from obligations on the part of the State subsequently assumed by virtue of its provisions.

On behalf of the towns it was claimed that the legislation of 1895 impaired the contract obligation entered into by the State with a bridge builder for the erection of a new bridge at the expense of the State.  The record, however, disclosed the fact that the bridge builder had accepted and pursued a remedy afforded him by one of the Acts of 1895, and pending the present litigation had released and discharged the State from all liability under said contract.  *Held* that this discharge left the towns or their representatives in no position to raise this constitutional objection; and that if the claim of the respondent was legally sound, its effect would be that the contract for a new bridge would remain in force so far as the bridge builder was concerned, but that such a result would not deprive the State of the power to compel the towns specially benefited by the execution of the contract to pay for the benefits thereby received.

It was also urged that by the Acts in question the towns were deprived of property without due process of law and denied the equal protection of the laws, in violation of the XIV. Amendment of the Constitution of the United States.  *Held* that no property of the towns had been or was to be taken, and that the proceedings and process by which it was now sought to compel the respondent to pay the amount in controversy, constituted due process of law.

The respondent as the treasurer of the town of Glastonbury refused to pay

an order lawfully drawn upon him by the district commissioners.  In mandamus proceedings to compel him to pay, it was *held* that there was no necessity for making the several towns or the highway district parties defendant; although the trial court might have summoned them in upon application, or admitted them as intervenors, as each had a vital interest in the questions of law involved.

In mandamus proceedings matters occurring after the suit is brought, can be properly considered in determining whether the writ shall be made peremptory.

ANDREWS, C. J., and HAMERSLEY, J., dissenting.

[Argued May 8th—decided June 25th, 1896.]

APPLICATION for a writ of mandamus requiring the town of Glastonbury to pay its share of the expenses incurred for the support and maintenance of the highway across the Connecticut river at Hartford, brought to the Superior Court in Hartford County and tried to the court, *Robinson, J.*, upon issues of fact and law raised by the respondent's return to the alternative writ; facts found and judgment rendered *pro forma* for the relators, and appeal by the respondent for alleged errors in the rulings of the court.  *No error.*

*Lewis E. Stanton* and *John R. Buck*, for the appellant (respondent).

The legislation in question is unconstitutional and void. The Act of May 24th, 1895, repeals the Act approved June 29th, 1893, under the provisions of which the contract of November 13th, 1894, was made, and also limits the amount of damages to be recovered for the breach of said contract, thereby impairing its obligations.  *Walker* v. *Whitehead*, 16 Wall. 317; *Wolff* v. *New Orleans*, 103 U. S. 367; *Fletcher* v. *Peck*, 6 Cranch, 135; *Sturges* v. *Crowninshield*, 4 Wheat. 200; Miller on the Const. pp. 530, 539–541; *Planter's Bank* v. *Sharp*, 6 How. (U. S.) 327; *Ogden* v. *Saunders*, 12 Wheat. 320; *Trustees* v. *Rider*, 13 Conn. 94–96; *Com.* v. *New Bedford Bridge*, 2 Gray, 339, 350; *Green* v. *Biddle*, 8 Wheat. 1, 93; *Havemeyer* v. *Iowa Co.*, 3 Wall. 294; *Louisiana* v. *Pillsbury*, 105 U. S. 300.  The Berlin Iron Bridge Company probably cannot raise the question of the validity of the Act, having surrendered the contract for a consideration; but that

company is not the only party affected by the Act, nor is it alone entitled to raise the question of its validity. There are three parties affected by the passage of these Acts: the State, the Berlin Iron Bridge Company, and the five towns named. The question of the validity of the Act is to be decided with reference to the situation of the parties affected by the contract and the Acts, at the time this action was commenced; otherwise, we are trying another and entirely different case. *State ex rel. Reed* v. *Ramsey,* 8 Neb. 286. See also *State ex rel. Willard* v. *Storrs,* 11 Neb. 104; *State ex rel. Franklin* v. *Cole, County Clerk,* 25 id. 342; *Candee, Ex parte,* 48 Ala. 386; *Day* v. *Callow,* 39 Cal. 593. If those parts of the Acts of May 24th and June 28th, 1895, which affect this contract are void, then so much of those Acts as puts the duty of maintenance on the five towns is void, because the sections relating to the contract are substantial and important sections of the Acts, and if any substantial part thereof falls, the whole law falls. *Warren et al.* v. *Mayor, etc.,* 2 Gray, 84; *State* v. *Wheeler,* 25 Conn. 290; *Pollock* v. *Farmers' Loan & Trust Co.,* 158 U. S. 635; *Poindexter* v. *Greenhow,* 114 id. 304, 305; *Sprague* v. *Thompson,* 118 id. 94.

The Special Act of June 28th, 1895, is in violation of Art. 14th, of the amendments of the Constitution of the United States, and of § 1 of Art. I. of the Constitution of this State, because it deprives the town of Glastonbury and the citizens thereof of their property without due process of law, and also denies to said town and the citizens thereof equal rights with the citizens of other towns under the law. Throughout the whole Act its provisions apply only to towns as corporate bodies. The commissioners are appointed by the General Assembly, being named in the Act. They are not the agents of the towns. They are put in absolute control, and the expenses they incur are to be paid by the towns named as an incorporated district. But the General Assembly cannot make a contract between two individuals, or two corporations, without their consent; it is impossible in the nature of things, for the essence of a contract is the agreement of the parties. *Sharpless* v. *Phila.,* 21 Pa. St. 165; *Bowdoin-*

ham v. *Richmond*, 6 Greenl. 112; *Hasbrouck* v. *Milwaukee*, 13 Wis. 37; *Atkins* v. *Randolph*, 31 Vt. 236; *Hampshire* v. *Franklin*, 16 Mass. 84; *Ellis* v. *Marshall*, 2 id. 268. In a law for purposes of taxation, there must be provision for the voting of the tax by the proper authority; there must be an assessment and an apportionment of the tax. Cooley on Tax., 2d Ed. pp. 243, 324. Such was the rule in this State prior to the adoption of the present Constitution, and has been the invariable rule ever since. But the Act does not provide for laying a tax, and there is no provision in the Act by which the town can know, at the time of laying its annual tax, what amount the town will be required to pay from time to time during the year, upon the order of the commissioners. That power of determining the amount is the vital point of the levying of a tax. It is a rule of our political system, that the power to impose taxes cannot be delegated to administrative or ministerial officers. Cooley on Tax., 2d Ed. pp. 61–66. The system of local taxation under compulsion of the legislature, adopted in a few of the States, has not been put in force here. Inasmuch as this Special Act, as a law of taxation, does not comply with the custom and law of this State, it is not " due process of law," and is void. *Weimar* v. *Bambury*, 30 Mich. 202; *Davidson* v. *New Orleans*, 96 U. S. 102. The Act does not accord equal rights to the citzens of Glastonbury, because by the settled law and custom of this State, communities are entitled to vote their own taxes for local improvements, determine the amount of those taxes, and how the money shall be expended. *Pollock* v. *Farmers' Loan Co.*, 157 U. S. 556; *McCullough* v. *Maryland*, 4 Wheat. 428. The Act compels the citizens of Glastonbury to pay for the construction and maintenance of a highway and bridges that are wholly outside of the limits of that town. No provision is made for ascertaining whether the town of Glastonbury is benefited or not. Nor does the legislature so find. The Act imposes the burden and leaves the taxpayer to find out why it was done, as best he can. The decree of the Superior Court in 1889 has no bearing upon the present case. The Act of 1887, on which it was based, was radically modified in

1889, and in 1893 was wholly repealed.  The cases in other
States cited by the relators, are not in point; for they rest
on statutes which gave the parties interested a right to be
heard before the question of benefit was determined.  The
legislature is not supreme in these matters, but is obliged to
follow some standard or rule.  *In re Washington Ave.*, 69
Penn. St. 352; *Hammett* v. *Phila.*, 15 P. F. Smith, 155; *Park
Com'rs* v. *Com. Council of Detroit*, 28 Mich. 228; *People* v.
*Mayor, etc.*, 51 Ill. 17, 31; Cooley on Const. Lim., 5th Ed.
235; *Simon* v. *Northrop*, (Or.) 40 Pac. Rep. 563.  The Act
provides no rule of apportionment of the ordinary expenses
of maintaining the highway and bridge; and is for this reason
unconstitutional.  *Barnes* v. *Dyer*, 56 Vt. 469; *Providence
Bank* v. *Billings*, 4 Pet. 562; *People* v. *Mayor, etc.*, 4 N. Y.
426; *Allen* v. *Drew*, 44 Vt. 174.

*Lewis Sperry* and *George P. McLean*, for the appellees
(relators).

The General Assembly has the power to establish a bridge
or highway district, and place the burden of the construction
and maintenance of a highway or bridge upon the towns or
localities included in said district.  Free highways and
bridges are constructed and maintained for the benefit of the
public.  It is impossible to apportion the expense equally
among the individuals that may use them.  Whether the
State, or Hartford county, or the five towns, or one town, is
compelled to pay for the bridge and causeways in question,
is unimportant.  *Granby* v. *Thurston*, 23 Conn. 415; *Bor-
ough of Stonington* v. *State*, 31 id. 214; *Abenddroth* v. *Green-
wich*, 29 id. 362; *Webster* v. *Harwinton*, 32 id. 131; *State ex
rel. Coe* v. *Tyler*, 48 id. 158; *Turney* v. *Bridgeport*, 55 id.
414; *Dailey* v. *New Haven*, 60 id. 320.  There is no common
law duty on towns to maintain highways.  *Chidsey* v. *Can-
ton*, 17 Conn. 478; *Mower* v. *Inhabitants of Leicester*, 9 Mass.
247; *Reed* v. *Inhabitants of Belfast*, 20 Me. 246.  In Desty
on Taxation, 5th Ed. pp. 276, 279, and 285, we find the
law stated as follows : The legislature, in the exercise of its
general powers of taxation as distinct from its power of local

assessment, may create a special taxing district; *Leehrman* v. *Taxing Dist.*, 2 Lea, 425; *Bowles* v. *State*, 37 Ohio St. 35, without regard to the municipal or political subdivisions of the State. *Shaw* v. *Dennis*, 10 Ill. 416; *Malchus* v. *Dist. of Highlands*, 4 Bush, 547; *Shelby Co.* v. *Railroad Co.*, 5 Bush, 225; *People* v. *Hawes*, 34 Barb. 69; and it is not essential that such districts should correspond with the political divisions. *People* v. *Central R. Co.*, 43 Cal. 398; *Malchus* v. *Dist. of Highlands*, 4 Bush, 547. It may create taxing districts without regard to any territorial division of the State, and confine the taxation to the district benefited. See also, *People* v. *Brooklyn*, 4 N. Y. 419; *Parker* v. *Challis*, 9 Kan. 155; *Conwell* v. *Connersville*, 8 Ind. 358; *Hingham, etc., Turnpike* v. *Norfolk Co.*, 6 Allen, 353; *Philadelphia* v. *Field*, 58 Pa. St. 320; *Langhorne* v. *Robinson*, 20 Gratt. 661. The legislature judges finally and conclusively upon all questions of policy, as upon all questions of fact involved in the determination of a taxing district. *Litchfield* v. *Vernon*, 41 N. Y. 133. Courts are without power to interfere with the legislative discretion, however erroneous it may be. *Scoville* v. *Cleveland*, 1 Ohio St. 138; *Gordon* v. *Cornes*, 47 N. Y. 611; *Allen* v. *Drew*, 44 Vt. 187; *Alcorn* v. *Hamer*, 38 Miss. 652; *Arbegust* v. *Louisville*, 2 Bush, 271; *Norwich* v. *County Comrs. of Hampshire*, 13 Pick. 62. The power of the General Assembly to form a bridge district like the one in question, and provide for the issue and payment of bonds for the construction of a public bridge, is in no way limited by the Federal or State Constitution. The legislature is the sole judge of benefits and assessments and methods of payment. Desty on Taxation, 277, 280–285; *People* v. *Flagg*, 46 N. Y. 406; *Slack* v. *Railroad*, 13 B. Mon. 28; *Williams* v. *Cammack*, 27 Miss. 210; *Alcorn* v. *Hamer*, 38 Miss. 652; *Daily* v. *Swope*, 47 Miss. 367; *State* v. *St. Louis*, 62 Mo. 244; *Baltimore* v. *State*, 15 Md. 376; *Mobile County* v. *Kimball*, 102 U. S. 243. Statutes regulating the construction and maintenance of highways and bridges are in no sense contracts with the town affected. Towns cannot acquire vested rights under such laws, and the power of the legislature to

change and redistribute these public burdens has always been conceded. *Scituate* v. *Weymouth*, 108 Mass. 130 ; *Brighton* v. *Wilkinson et al.*, 2 Allen, 27 ; *Carter* v. *Bridge Proprietors*, 104 Mass. 236 ; *Att'y-Gen.* v. *Cambridge*, 16 Gray, 247 ; *Agawam* v. *Hampden*, 130 Mass. 530 ; *New Haven & Fairfield Counties* v. *Milford*, 64 Conn. 573 ; *East Hartford* v. *Hartford Bridge Co.*, 10 How. (U. S.) 533. The respondent town is "specially benefited" by the highway and bridge in question. The decree of the Superior Court, ordered as it was after formal hearing, in which hearing the present parties, *i. e.*, the State and the respondent town were parties, is conclusive and final as an adjudication on the question of benefits, and is as binding on the respondent as when it was first entered on the records of the court. *Holcomb* v. *Phelps*, 16 Conn. 132 ; 1 Van Fleet's Former Adjudication, p. 603 ; *Ashton* v. *Rochester*, 133 N. Y. 187. This decree, however, is not essential to our case, because the General Assembly has power to order a locality or district to construct and maintain a public bridge or highway, and the proportion to be paid by each municipality cannot be reviewed by the courts. *Gordon* v. *Cornes*, 47 N. Y. 608. The contract with the Berlin Iron Bridge Co. cannot be taken advantage of by the respondent, in this or any other proceeding. The Acts of 1895 do not in any way violate the obligations of this contract. If the Acts of 1895 do abrogate the contract, The Berlin Iron Bridge Company is the only party whose complaint can be heard by the courts. The contract having been surrendered and canceled by the party for whose benefit it was written, the Act stands as valid and constitutional in every respect as though the contract had never existed. All public or private Acts are presumed to be constitutional ; and if the party aggrieved by an unconstitutional provision acquiesces in its operation, he waives his right to question its validity, and the law operates as to all parties from the date of its passage. *Sturges* v. *Crowninshield*, 4 Wheat. 200, 207 ; Cooley, Const. Lim. 5th Ed. 197, 349 ; *Von Hoffman* v. *City of Quincy*, 4 Wall. 553 ; *Mason* v. *Haile*, 12 Wheat. 378 ; *Bronson* v. *Kinzie*, 1 How. (U. S.) 316 ; *Gunn*

v. *Barry*, 15 Wall. 623; *Munn* v. *Illinois*, 94 U. S. 132; *Embury* v. *Conner*, 3 N. Y. 511; *Detmold* v. *Drake et al.*, 46 N. Y. 318; *Wellington, Petitioner*, 16 Pick. 87, 96; *Smith* v. *McCarthy*, 50 Penn. St. 359. The relators clearly have the right to show that after this action was commenced, the contract relied upon by the respondent was canceled, and the State discharged from all liability. Merrill on Mandamus, § 297. This action was properly brought by the commissioners and in their name. Special Acts of 1895, Chap. 343, § 7. Nor was it essential or proper to join as respondents the treasurers of all the five towns. Merrill on Mandamus, § 24; *State* v. *Chester*, 10 N. J. L. 292; *State* v. *Beloit*, 20 Wis. 79. There is no common or joint liability on the part of the other four towns to pay Glastonbury's share of the expenses.

BALDWIN, J. The provision of suitable means of communication between the opposite banks of the Connecticut river has been, from early Colonial days, a frequent subject of legislation by the General Assembly. Numerous ferries have been set up, from time to time, at different points, by virtue of franchises conferred in some cases upon towns, and in others upon individuals; and several toll-bridges have been erected during the present century, under charters granted to private corporations.

One of these bridges took the place of an ancient ferry between the towns of Hartford and East Hartford, in which each town had a proprietary interest. The bridge company, by a voluntary settlement, paid to Hartford a satisfactory compensation for the revocation of its ferry franchise; but declined to recognize any claim of East Hartford, the original grant to which, by its express terms, was only during the pleasure of the General Assembly, and had been repealed without qualification. Litigation resulted, and this court held that no rights of East Hartford had been violated; a decision afterwards affirmed, upon proceedings in error, by the Supreme Court of the United States. In the opinion there delivered, it was held that the State, on the one hand,

and the town of East Hartford, on the other, did not stand, with reference to the grant and repeal of the ferry franchise, in the attitude of parties to a contract. " The legislature," it was declared, " was acting here on the one part, and public municipal and political corporations on the other. They were acting, too, in relation to a public object, being virtually a highway across the river, over another highway up and down the river. From this standing and relation of these parties, and from the subject-matter of their action, we think that the doings of the legislature as to this ferry must be considered rather as public laws than as contracts. They related to public interests. They changed as those interests demanded. The grantees likewise, the towns being mere organizations for public purposes, were liable to have their public powers, rights, and duties modified or abolished at any moment by the legislature.

" They are incorporated for public, and not private objects. They are allowed to hold privileges or property only for public purposes. The members are not shareholders, nor joint partners in any corporate estate, which they can sell or devise to others, or which can be attached or levied on for their debts.

" Hence, generally, the doings between them and the legislature are in the nature of legislation rather than compact, and subject to all the legislative conditions just named, and therefore to be considered as not violated by subsequent legislative changes.

" It is hardly possible to conceive the grounds on which a different result could be vindicated, without destroying all legislative sovereignty, and checking most legislative improvements and amendments, as well as supervision over its subordinate public bodies.

" Thus, to go a little into details, one of the highest attributes and duties of a legislature is to regulate public matters with all public bodies, no less than the community, from time to time, in the manner which the public welfare may appear to demand.

" It can neither devolve these duties permanently on other

public bodies, nor permanently suspend or abandon them itself, without being usually regarded as unfaithful, and, indeed, attempting what is wholly beyond its constitutional competency.

"It is bound, also, to continue to regulate such public matters and bodies, as much as to organize them at first. Where not restrained by some constitutional provision, this power is inherent in its nature, design, and attitude ; and the community possess as deep and permanent an interest in such power remaining in and being exercised by the legislature, when the public progress and welfare demand it, as individuals or corporations can, in any instance, possess in restraining it." *East Hartford* v. *Hartford Bridge Co.,* 10 How. 511, 533.

· In view of these principles of constitutional law, an Act was passed by the General Assembly in 1887 for the purpose of making this same bridge a free public highway and throwing the burden of its support on the towns which would be especially benefited by such a change. At that time there were three toll-bridges across the Connecticut river in Hartford county. By this Act, which was entitled "An Act to establish Free Public Highways across the Connecticut River in Hartford County" (Public Acts of 1887, Chap. 126, p. 746), the State's Attorney was directed to bring a complaint in the name of the State to the Superior Court for that county, against the corporations owning these bridges, for the purpose of making each of them a free public highway. Notice of the pendency of the proceeding was to be given to all towns interested, and any town might appear and become a party. Commissioners were to be appointed by the court, who should "lay out and establish highways across the Connecticut river where the toll bridges in said county now are, and across said bridges and across and along the causeways and approaches appurtenant to and connected therewith."

The commissioners, after such notice as the court should prescribe as to those towns which they should deem interested, were to "estimate and assess the damages caused by the lay-out and establishment of such free highways, and

shall estimate and assess said damages upon the several towns which they shall find will be specially benefited by the lay-out and establishment of said highways, as benefits accruing to said several towns, in such proportion as said commissioners shall find to be equitable." Their report, if accepted by the court, was to be "final and conclusive as to all matters therein contained, and said court shall render judgment thereon against said several towns for the amount assessed against them respectively; and the clerk of said court shall forthwith notify each of said towns of the judgment against it, by mailing to the clerk thereof a notice specifying the date and amount of such judgment."

The Act also contained the following provisions:—

"Sec. 5. Said towns so assessed shall, within three months from the rendition of said judgment, deposit with the treasurer of this State the sums so severally assessed against them; and at the expiration of said three months the comptroller shall draw his order on the treasurer in favor of the several persons or corporations in whose favor damages have been assessed for the amount of damages so assessed respectively; and said treasurer shall hold the amount thereof for the benefit and subject to the order of the several parties in whose favor said orders were drawn, and shall notify said several parties that he so holds said amounts, and thereupon said highways so laid out as aforesaid shall become and remain public highways. In case any town shall fail to pay the judgment rendered against it as aforesaid, within the time aforesaid, said court shall order execution upon said judgment to be issued against said town in favor of the State."

Each town so assessed was given, by § 6, power to issue bonds to raise the money to pay its assessment.

"Sec. 7. When said highways, so established as aforesaid, shall have become free public highways as aforesaid, the same shall thereafter be maintained by said towns so assessed in proportion to the assessment upon said towns as hereinbefore provided. The first selectmen of said several towns shall meet on the second Monday after said highways shall have become free highways as aforesaid, at the office of the select-

men in Hartford, and annually thereafter and at such other times as they shall deem necessary, and said several first selectmen shall constitute a board for the care, maintenance, and control of said highways. Said board shall appoint a chairman, secretary, and treasurer ; and said board shall apportion the expense of repairing and maintaining said highways upon the said several towns in proportion to the assessment against said towns as aforesaid, and said chairman shall draw his order on the respective treasurers of said towns to the order of the treasurer of said board for the proportional amount payable by said towns as aforesaid for such repairs and maintenance. Any damages resulting from the defective condition of said highways or the bridges upon the same, shall be paid by said towns in proportion to the said assessment. For the purpose embraced in this section said board shall be a body politic and corporate by the name of The Board for the Care of Highways and Bridges Across the Connecticut River in Hartford County, and actions may be brought against said board by service upon its secretary, and any judgment recovered therein shall be paid by said towns in said proportions and in the same manner as herein provided for the payment of the expenses of repairs and maintenance as aforesaid. Said board shall annually report to said several towns the expenses incurred and paid by them during the preceding year."

By a joint resolution, approved on the same day, it was provided that this Act should not affect the bridge between Windsor Locks and Warehouse Point, nor that between Suffield and Enfield.

Due proceedings were had under the Act, resulting in a final judgment in 1889, establishing a free public highway across the river between Hartford and East Hartford, including the bridge and causeway of the Hartford Bridge Company, and awarding it $210,000 damages. The court also " found that the towns of Hartford, East Hartford, Glastonbury, South Windsor, and Manchester, will be specially benefited by the lay-out and establishment of such free highway, and estimated and assessed said damages upon said several

towns as benefits accruing to said several towns in such pro-
portion as said commissioners found to be equitable, that is
to say, as follows: To the town of Hartford ninety-five
thousand ($95,000) dollars, to the town of East Hartford
sixty-six thousand ($66,000) dollars, to the town of Glaston-
bury twenty-five thousand ($25,000) dollars, to the town of
South Windsor twelve thousand ($12,000) dollars, to the
town of Manchester twelve thousand ($12,000) dollars."

Pending the action, the General Assembly in 1889 appro-
priated $84,000 from the treasury of the State, for the pur-
pose of paying forty per cent of these damages.    10 Special
Laws, p. 1321.    In view of this, the judgment of the Superior
Court concluded with an order that " the town of Glaston-
bury shall within three months from the date of rendition of
this judgment, deposit with the treasurer of this State the
sum of fifteen thousand ($15,000) dollars, the same being 60
per cent. of the sum so assessed against it," and a like pro-
vision with respect to the assessment against each of the
other four towns, and a further order that " at the expiration
of said three months from the date of the rendition of this
judgment the comptroller of the State shall draw his order
on the treasurer in favor of the Hartford Bridge Company
for the sum of $210,000, the same being the amount of the
damages that have been so assessed in its favor, and that the
treasurer shall hold the amount thereof, viz.: said two hun-
dred and ten thousand ($210,000) dollars, for the benefit
and subject to the order of said Hartford Bridge Company,
and shall forthwith notify said Hartford Bridge Company
that he so holds said amount, and thereupon as soon as the
treasurer shall give said notice said highway so laid out as
aforesaid shall become and remain a public highway.

" The treasurer of the State shall at the same time give notice
to the first selectman of each of said towns, viz.; Hartford,
East Hartford, Glastonbury, South Windsor and Manchester,
that said highway has become a free public highway to be
thereafter maintained by said towns."

After this judgment had been fully executed, the General
Assembly, in 1893, passed an Act (Public Acts of 1893,

Chap. 239, p. 395) declaring that the highway, which included the bridge and its approaches, should thereafter be maintained by the State at its expense, and providing for the appointment, on the nomination of the Governor, of a board of three commissioners, for the care, maintenance and control of the highway, such expenses as they might incur for repairing and maintaining it to be paid from the State treasury on the order of the Comptroller. All Acts inconsistent therewith were repealed.

Commissioners were duly appointed under this Act, who soon afterwards, the bridge having become unsafe, executed a contract in behalf of the State with the Berlin Iron Bridge Company for the erection of a new one at a cost of over $300,000. After the company had begun the work of construction, the old bridge was accidentally destroyed by fire, and the commissioners thereupon ordered, under one of the provisions of the contract, the erection of a temporary bridge by the same company.

While it was fulfilling this order, an Act was passed, which was approved and took effect May 24th, 1895 (Public Acts of 1895, Chapter 168, p. 530), repealing the Act of 1893, and requiring the towns of Hartford, East Hartford, Glastonbury, South Windsor and Manchester thereafter to maintain the highway across the Connecticut river where the old bridge formerly was, with the proper approaches, and to erect a new bridge whenever necessary, and maintain the same, contributing to any expenses to which they might be thus subjected, "in proportion to the assessment made upon said towns by the Superior Court in the proceedings in which said highway was laid out and established; that is to say: Hartford, ninety-five two-hundred-and-tenths; East Hartford, sixty-six two-hundred-and-tenths; Glastonbury, twenty-five two-hundred-and-tenths; South Windsor, twelve two-hundred-and-tenths; Manchester, twelve two-hundred-and-tenths." Half the taxes received by the State, during the next five years, from any street railway companies using the bridge, was to be paid over to the towns in proportion to their assessments, and ten per cent of such receipts during each succeed-

ing year. A commission was also appointed to hear and determine all legal claims, not exceeding in all $40,000, for any contract obligations already incurred by the bridge commissioners; their decision in favor of such claimants to be final against the State, and any sums awarded by them, not exceeding $40,000, to be paid from the State treasury. If any claimant were dissatisfied with their decision, he was at liberty to bring suit against the State in the Superior Court, and should the Berlin Bridge Company so sue, then whether it proved the existence of any valid contract with the bridge commissioners under the Act of 1893, or not, it was to be entitled to recover for all materials furnished or expenses incurred under or in connection with any contract with the commissioners, including all legal expenses. Any judgment of the court in favor of the claimant in any suit was to be paid from the State treasury. If the contract already described, between the Berlin Iron Bridge Company and the bridge commissioners, should be adjudged valid, ·then the Comptroller was directed to carry it out and pay the contract price; in such case the towns were not to receive half the railway taxes for five years, but were to receive ten per cent of them annually, and were to remain charged with the perpetual maintenance and repair of the highway over the river, including the new bridge.

On June 28th, 1895 (Special Acts of 1895, Chap. 343, p. 485), a Private Act was passed, entitled an Act " Creating the Connecticut River Bridge and Highway District." By this the towns of Hartford, East Hartford, Glastonbury, Manchester, and South Windsor were constituted a corporation under the name of the Connecticut River Bridge and Highway District, " for the construction, reconstruction, care, and maintenance of a free public highway across the Connecticut river at Hartford and the causeway and approaches appertaining thereto, as described in a decree of the Superior Court of Hartford county, passed on the tenth day of June, 1889, in which decree said highway was laid out and established." Four citizens of Hartford and one from each of the other towns were appointed " commissioners for said district,

with authority to maintain said free public highway, and whenever public safety or convenience may require, to erect new bridges along or upon said highway, to reconstruct, raise, and widen the causeway and approaches appurtenant to or a part of said highway, at the expense of the towns named in section one of this Act and composing said bridge district, at a cost not exceeding five hundred thousand dollars." This board was to report annually to the several towns the expenses incurred and paid by it during the year preceding. It was authorized to issue the bonds of the district to an amount not exceeding $500,000, to provide means for building a new bridge or improving the highway across the river. Each of the five towns, in order to meet the principal and interest due and to become due upon these bonds, was to pay over to the treasurer of the commission, on his written order, annually, twenty-five cents on each thousand dollars of its grand list, until its share of the whole had been fully satisfied, in the proportion of Hartford 79/100, East Hartford 12/100, Glastonbury 3/100, Manchester 3/100, and South Windsor 3/100; and for the ordinary support and maintenance of said highway each town was also directed to pay upon the orders of the commission, from time to time, such further sums as the commission might determine as its proper proportion of the total expense under the provisions of the Act, and to provide for such payments in voting its annual tax levy. Half of all taxes received by the State, during the next five years, from street railway companies using the bridge, and ten per cent annually of all future receipts of the same character, were to be paid to the treasurer of the commission. The commissioners were given full power to construct and reconstruct all necessary bridges and approaches, and their orders were made obligatory upon the towns, and sufficient authority for the town treasurers to pay any sums to the treasurer of the commission, which the commission might direct. The courts were empowered to enforce by mandamus or otherwise, any orders of the commissioners made under authority of the Act. The commissioners under the Act of 1893 were directed to turn over all property and papers in

their hands to the new board.   The latter was authorized to assume the cost of constructing the temporary bridge which was in course of erection under the contract made by the commissioners under the Act of 1893.   So much of the Public Act of May 24th, 1895, as fixed the proportion in which each town was to contribute to the cost of constructing and maintaining the bridge and highway, was repealed.

The judgment, brought up for review by this appeal, directed the issue of a writ of peremptory mandamus, to enforce the payment by the treasurer of the town of Glastonbury of an order drawn upon him by vote of the Commissioners for the Connecticut River Bridge and Highway District for 3/100 of the sum of $500, required to meet expenses incurred by the board for the ordinary support and maintenance of the highway under their charge.   In behalf of the town it is contended that it cannot thus be compelled to contribute, at the dictation of officials not of its own choosing, to the cost of maintaining a highway which is wholly outside of its territorial bounds.

It has undoubtedly been the general policy of the State to leave the expense of public improvements for highway purposes to the determination of the municipal corporations within the limits of which the highways may be situated, and to charge them only with such obligations as may be incurred in their behalf by officers of their own selection. But when the State at large or the general public have an interest in the construction or maintenance of such works, there is nothing in our Constitution, or in the principles of natural justice upon which it rests, to prevent the General Assembly from assuming the active direction of affairs by such agents as it may see fit to appoint, and apportioning whatever expenses may be incurred among such municipalities as may be found to be especially benefited, without first stopping to ask their consent.   *Norwich* v. *County Commissioners*, 13 Pick. 60 ; *Rochester* v. *Roberts*, 29 N. H. 360 ; *Philadelphia* v. *Field*, 55 Pa. St. 320 ; *Simon* v. *Northup*, 27 Or. 487, 40 Pac. Rep. 560.   As against legislation of this character, American courts generally hold that no plea can

be set up of a right of local self-government, implied in the nature of our institutions.  *People* v. *Draper*, 15 N. Y. 532, 543; *People* v. *Flagg*, 46 N. Y. 401, 404; *Commonwealth* v. *Plaisted*, 148 Mass. 375, 19 Northeastern Rep. 224.

The Constitution of Connecticut was ordained, as its preamble declares, by the people of Connecticut. It contemplates the existence of towns and counties; and without these the scheme of government, which it established, could not exist. It secured to these territorial subdivisions of the State certain political privileges in perpetuity, and among others the election by each county of its own sheriff, and by each town of its own representatives in the General Assembly, and its own selectmen and such officers of local police as the laws might prescribe. It secured them, because it granted them; not because they previously existed. Towns have no inherent rights. They have always been the mere creatures of the Colony or the State, with such functions and such only as were conceded or recognized by law.  *Webster* v. *Harwinton*, 32 Conn. 131. The State possesses all the powers of sovereignty, except so far as limited by the Constitution of the United States. Its executive and judicial powers are each distributed among different magistrates, elected some for counties, and some for the State at large; but its whole legislative power is vested in the General Assembly. Our Constitution imposes a few, and only a few, restrictions upon its exercise, and except for these the General Assembly, in all matters pertaining to the domain of legislation, is as free and untrammeled as the people would themselves have been, had they retained the law-making power in their own hands, or as they are in adopting such constitutional amendments from time to time as they think fit.  *Pratt* v. *Allen*, 13 Conn. 119, 125 ; *Booth* v. *Town of Woodbury*, 32 id. 118, 126. It has not infrequently, from early Colonial days, made special provision for particular highways or bridges, and in several instances by the appointment of agencies of its own to construct or alter them at the expense of those upon whom it thought fit to cast the burden. 1 Col. Rec. 417; 5 id. 80; 13 id. 605, 630; 1 Private Laws, 282, 285.

By legislation of this nature the city of Hartford was recently compelled to contribute a large sum for a separation of grades at the Asylum street railroad crossing, and we held the Act to be not unconstitutional. *Woodruff* v. *Catlin*, 54 Conn. 277; *Woodruff* v. *New York & N. E. R. R. Co.*, 59 id. 63, 83.

That so many laws of this general description have been enacted by the General Assembly, both before and since the adoption of our Constitution, is, of itself, entitled to no small weight in determining whether they fall within the legitimate bounds of what that instrument describes as "legislative power." *Maynard* v. *Hill*, 125 U. S. 190, 204; *Wheeler's Appeal*, 45 Conn. 306.

One of those to which reference has been made (1 Priv. Laws, p. 285), required the town of Granby to build and maintain a bridge across the Farmington river, half of which was in the town of Windsor, and was adjudged to be valid by this court, notwithstanding then as now the General Statutes provided that bridges over rivers dividing towns should be built and maintained at their joint cost. *Granby* v. *Thurston*, 23 Conn. 416. There is no principle of free government or rule of natural justice which demands that the support of highways and bridges shall be imposed only on those territorial subdivisions of the State in which they are situated. If it be required of them, it is only by virtue of a statute law, which the legislature can vary or repeal at pleasure. *Chidsey* v. *Canton*, 17 Conn. 475, 478. The burden is one that the legislature can put on such public agencies as it may deem equitable, and transfer from one to another, from time to time, as it may judge best for the public interest. *Dow* v. *Wakefield*, 103 Mass. 267; *Agawam* v. *Hampden*, 130 Mass. 528; *County of Mobile* v. *Kimball*, 102 U. S. 691, 703; *Washen* v. *Bullitt County*, 110 U. S. 558.

The defendant urges that taxation and representation are indissolubly connected by the underlying principles of free government, and that this (the commission which directs the affairs of the Bridge District and makes requisitions on the towns for such funds as it deems necessary, not having been

selected by them) is a sufficient defense against the payment of the order which has been drawn upon him, since it can be paid only out of moneys raised by town taxation.

Taxes can, indeed, under our system of government, only be imposed by the free consent of those who pay them, or their representatives; and for purposes which they approve. But the inhabitants of these towns were represented in the General Assembly, by which the laws now brought in question were enacted. The legislative power, after defining the general purposes of taxation, to confer upon local public corporations the right to determine the amount of the levy within the territory under their jurisdiction, is unquestionable; and in its exercise it is immaterial whether the corporations, to which that function is entrusted, or between which it is shared, be called counties or towns, school districts or bridge districts. When a levy is voted, the action is corporate action, deriving its obligatory force wholly from the authority of the State. Towns cannot tax their inhabitants for any purpose except by virtue of statute law. That law for many years required them annually to tax for moneys to be paid over to the State treasurer for State expenditures. It now requires them to tax, as occasion may require, for moneys to be paid over to the county treasurer for county expenditures. It can equally require any town or towns to tax for moneys to be paid over to the treasurer of a bridge or highway district, in which they are included, for district expenditures. *Kingman et al., Petitioners*, 153 Mass., 566, 27 Northeastern Rep. 778.

It has been suggested that in Colonial times it was the right of the inhabitants of every town, themselves, to order the municipal duties assigned to them and choose the officers by whom only it could be placed under a pecuniary obligation, and that this is one of those rights and privileges " derived from our ancestors," to " define, secure and perpetuate " which our Constitution was adopted, and to which its preamble refers. If it can be said that such a right ever existed, it was not one of the nature of those which were described by the framers of the Constitution. They were speaking of

rights personal to the individual, as a citzen of a free common-wealth; civil as distinguished from political; and belonging alike to each man, woman and child among the people of Connecticut. Such of them as they deemed most essential they proceeded to specify in the Declaration of Rights, and here we find asserted (Art. 1, § 2) that "all political power is inherent in the people, and all free governments are founded on their authority" and subject to such alterations in form, from time to time, "as they may think expedient." If there were any absolute right in the inhabitants of our towns to regulate their town finances and affairs which was superior to all legislative control, it would be a great " political power." It would create an *imperium in imperio*, and, invest a certain class of our people—those qualified to vote in town meetings—with the prerogative of defeating local improvements which the General Assembly deemed it neces-sary to construct at the expense of those most benefited by them, under the direction of agents of the State, unless the work were done and its cost determined under town control. No set of men can lay claim to such a privilege under the Constitution of Connecticut.

The defendant further insists that the act of June 28th is void, because in § 4 it requires payments from the town treasuries without providing the necessary means; the au-thority given to raise the necessary funds in the annual tax-levy being of no avail because the Bridge District is not required to submit any estimate of the amount needed for the ensuing year, before the time for laying the tax. There is no substance to this objection. So far as concerns the principal and interest of any bonds that may be issued, each town is expressly directed to pay to the district, annually, twenty-five cents for each thousand dollars of its grand list, until enough has been thus received to satisfy its proportion-ate share. As to the ordinary expenses of maintenance, the commission is to draw orders on each town from time to time for such sums as it may determine as the proportion of such town under the provisions of the Act. The rule for ascer-taining this proportion is that previously laid down in the

same section; and it is to be presumed that the commission will make such reports to each town before its annual town meeting, as will enable it to lay all taxes necessary to meet its probable expenses for the succeeding year. As to those of the first year, there is nothing on the record to indicate that the share of any town could have been large enough to cause it the slightest embarrassment.

No valid exception can be taken to this rule of apportionment, according to which the expenses of the Bridge District are to be distributed among the several towns.

The Acts of 1895, under which the present action has arisen, both refer to and in a sense rest upon the Act of 1887. That was designed to secure the perpetual maintenance of the Hartford bridge as a free highway, at the expense of those towns to which it might be found to be of especial benefit. The duty of ascertaining which towns would be thus benefited was intrusted to the Superior Court. It might have been undertaken by the legislature itself, but it was entirely proper to make it the subject of proceedings of a judicial character, to be instituted by the State. *Salem Turnpike & Chelsea Bridge Corporation* v. *County of Essex*, 100 Mass. 282. This duty was fulfilled; and since the date of the final decree in that cause, there has been and there could be no material change in any of the conditions by which it was determined. Whatever towns were most benefited in 1889 by the perpetual maintenance of a free bridge, must be most benefited by it in 1895. This was purely a question of proximity. Hartford is the natural market of all the neighboring towns lying within easy driving distance. From several of these she is separated by a navigable river, which is outside of her boundaries as well as of theirs. Ferries had been tried as a means of communication, and found inadequate. A toll-bridge had then been established, and with the same result. The next step naturally was to provide for a free bridge. Four towns east of the river have been judicially found to derive a special benefit from this, and while the proportionate benefits accruing to each, as well as those to Hartford, may vary from time to time, with changes in population and

industrial or social conditions, some benefit, and some especial benefit, to each of the group must, in the nature of things, always be felt. On this point they were fully heard before a competent tribunal, which, after due notice to every town in the State, and long consideration, selected them out of all the rest.

Complaint is made because, while by the decree of the Superior Court, Glastonbury was charged with 25/210 of the cost of erecting and maintaining a bridge at this point, and this proportion was re-affirmed by the General Assembly, in the Act of May 24th, 1895, by that of June 28th, 1895, it was cut down to 3/100, and other changes made, with the result of reducing the assessment of every town except Hartford, the burden thrown upon which was largely increased.

There is no reason why the relative amount of benefits, which each of the five towns, as compared with the rest, derives from the bridge, may not vary from one period of time to another; and any such variation might present an equitable ground for making a corresponding change in its proportionate assessment for the expenses of construction or maintenance. (That what was the proper share of each was determined in 1889 by a judicial proceeding, did not preclude a re-adjustment for due cause, in 1895, by a legislative proceeding; nor did the Act of May 24th, 1895, put it out of the power of the General Assembly to reconsider its action, as was, in effect, done by the Act of June 28th) *Scituate* v. *Weymouth*, 108 Mass. 128. We are bound to presume that there was due cause for making the apportionment finally determined on, for it is certain that there might have been. A comparison of the censuses of the United States for 1880 and 1890, between which dates the proceedings under the Act of 1887 were brought to a conclusion, shows that while, during the intervening decade, the population of Hartford, East Hartford, and Manchester had been largely increased, that of Glastonbury and South Windsor had suffered a substantial loss. The organization of modern society is such as to foster the growth of cities and their suburbs, at the ex-

pense of country towns dependent for their prosperity on agricultural pursuits. The street railways, from the taxes paid by which the treasury of the Bridge District was to be in part supplied, run from Hartford to the towns across the river, and from their inhabitants a large part of the fares collected may be derived. In view of all these matters, the General Assembly may well have concluded, when by the Act of June 28th they were about to supply the necessary machinery for carrying into effect the main object of the Act of May 24th, that Hartford, with its rapidly increasing business and population, ought in fairness to relieve the lesser towns in the Bridge District of part of the burden to which they were subject under previous legislation.

Nor is it of any importance that in 1893 the State had taken the maintenance of the bridge upon itself. This was merely a gratuitous act, with no element of a contract, and gave rise to no vested rights, except such as might accrue from obligations on the part of the State subsequently assumed by virtue of its provisions.

It is contended that such an obligation was contracted in favor of the Berlin Iron Bridge Company, and was impaired by the legislation of 1895. If so, this legislation would be so far forth invalid as against that company, under Art. I, § 10 of the Constitution of the United States. The result would be that the contract made between it and the bridge commissioners, acting under the Act of 1893, would remain in force; but not that the State could not compel the towns especially benefited by its execution to pay for the benefits received. In fact, however, the pleadings show that the Bridge Company, availing itself of the remedy tendered by the Act of May 24th, 1895, presented its claim for breach of contract to the commission appointed to examine it, and pending this action has accepted their award, and discharged the State from all demands. This, at all events, left the towns or their representatives in no position to raise this objection on constitutional grounds. In mandamus proceedings matters occurring after the suit is brought can be properly considered in determining whether the writ shall be made peremptory.

The defendant also urges that the Act of June 28th violates the XIVth Amendment of the Constitution of the United States, in that it deprives the town of Glastonbury of property without due process of law, and denies to it the equal protection of the laws. No right, as against a State, to the equal protection of the laws is secured to its municipal corporations by this amendment, which can limit in any way legislation to, charge them with public obligations. Nor have their inhabitants, in their capacity of members of such corporations, any greater rights or immunities. *New Orleans* v. *New Orleans Water Works Co.*, 142 U. S. 79, 93. No property of the town of Glastonbury has been or is to be taken. *Booth* v. *Town of Woodbury*, 32 Conn. 118, 130; *Railroad Company* v. *County of Otoe*, 16 Wall. 667, 676. A duty to lay taxes for public purposes has been imposed, and for reasons already stated, it was competent to the General Assembly to create that duty, as it was created. Their proceedings were due proceedings: the process by which it is now sought to compel the defendant to pay the sum in controversy is due process. The town can found no claim, under the Constitution of the United States, any more than under that of Connecticut, to such right of local self-government as precludes the General Assembly from exacting this payment, notwithstanding the demand comes from another municipal corporation, the Bridge District, in choosing whose members, or directing whose affairs, it has had no share. *Giozza* v. *Tiernan*, 148 U. S. 657, 662.

We have spoken of the Bridge District as a municipal corporation, although it may not answer the common law definition of that term, since not composed of the inhabitants of any territory as such. In modern times corporations, both public and private, have often been constituted by a union of other corporations. Such was the United States of America after the Declaration of Independence, and until the adoption of their present Constitution. Such are the various counties of this State, once *quasi* corporations and now full corporations, the constituents of which have always been the several towns within their boundaries. The power of

JUNE, 1896. 157

State ex rel. Bulkeley et al. *v.* Williams, Treasurer.

the Bridge District over the towns composing it is no less than it would have been, had their inhabitants individually been made its members. The district and the towns are alike agencies of the State for governmental purposes and, whether they be styled public or municipal corporations, their relations to it and to each other are the same, and equally subject to modification at its pleasure.

The defendant having refused to pay an order lawfully drawn upon him in behalf of the Bridge District, the writ was properly issued against him. There was no necessity for making the several towns or the Bridge District parties defendant. The Bridge District was, in effect, the relator; no town other than Glastonbury had any legal interest in the controversy; and Glastonbury itself had none in this suit, by which it was charged with no wrong, and in which the only remedy sought was one to compel the performance of a statutory duty incumbent on its treasurer, as such. The writ of mandamus must run singly to the party who is bound to do the particular act commanded. *Farrell* v. *King*, 41 Conn. 448, 453.

While not necessary parties, the Superior Court might and, no doubt, would have summoned in any or all of the five towns, or the Bridge District, or admitted any of them as intervenors, had application to that effect been made; for each had a vital interest in the questions of law on which the case must turn. General Statutes, §§ 884, 887, 890. No order of this nature, however, having been sought from any quarter, their absence can furnish no ground of appeal.

There is no error in the judgment appealed from.

In this opinion TORRANCE and FENN, Js., concurred.

ANDREWS, C. J. (dissenting). (I deem it clear and certain that the duty which the Act referred to authorized the relators to perform, was a town duty. Nowhere in the Act are the relators made State officers and charged with State duties; but on the contrary they are spoken of as town officers set to transact town affairs.) The maintenance of the

highway of which the relators have the care, cannot be regarded as anything other than a town duty, without imputing to the legislature the intent to inflict on these towns the monstrous injustice of making their inhabitants liable to pay the damages caused by the non-feasance or a misfeasance of a duty not imposed on them by law. The relators are totally unlike the commissioners appointed in the case of the Asylum street railroad crossing. In that case the State, in the exercise of its sovereign authority, appointed its own officers to abate a nuisance dangerous to human life, for the existence of which the three corporations named were jointly responsible. *Woodruff* v. *Catlin*, 54 Conn. 277, 295 ; *Woodruff* v. *N. Y. & N. E. R. R. Co.*, 59 id. 63.

The relators, although appointed to transact town affairs, are—six of them—not inhabitants of Glastonbury. They were not elected by the inhabitants of that town, nor has that town any control over their conduct. And from so much of the opinion as holds that the order of the relators is obligatory on that town through the town treasurer, I wholly dissent.

(It would be admitted without dispute that it would be incompetent for the legislature to engage in the performance of the affairs of a private corporation, by officers of its own appointment. The legislature chartered the New York, New Haven & Hartford Railroad Company, and may alter or repeal that charter at pleasure ; but the legislature cannot appoint a superintendent or a general manager of the affairs of that company, without its consent, for whose acts or negligence the corporation should be liable. Such an appointment, if by any possibility the legislature should ever make one, would probably be held void as not being a legislative act. But if held valid, it could only be on the ground that as the legislature might put an entire end to the existence of that corporation, it could do the same thing by piecemeal or by indirection.

The difficulty with the appointment of these commissioners is not with the power of the legislature to establish agencies for the execution of governmental functions, nor with its power

to provide for the maintenance of certain public highways through State, as distinguished from municipal agencies, and for the cost of such maintenance by taxation of the inhabitants of those localities most directly interested in such maintenance. The real difficulty is with the power of the legislature, under the provisions of the State Constitution, to give the whole execution and control of duties and powers assigned to towns, to persons in whose selection the towns have no agency direct or indirect, and over whose conduct they have no control.

It will be a surprising doctrine to the people of this State, even if only suggested, that the Constitution by the grant of legislative power has conferred on the legislature the authority to take from them the management of their local concerns and the choice of their own local officers. It would be hardly more surprising to them to be told, that by adopting the Constitution they had granted to their own representatives the legal authority to take away their liberties altogether.

The building and repair of highways has always been one of the principal duties of a town. In Ludlow's Code of 1650, it was ordered that each town should every year choose one of its inhabitants as surveyor to take care of the highways, with power to call out the persons fit for labor, for as many days as might be necessary to keep the same in repair. Subsequently the work was provided for by town taxation, and the oversight committed to the selectmen, who were specially charged with mending and repairing the bridges and roads used by the stage that carried the mails. From 1643 to the present time, the duty and the corresponding powers in reference to the support of highways has been recognized as essentially a corporate duty belonging to the towns, to be performed by town officers; *New Haven* v. *Sargent*, 38 Conn. 53; *Suffield* v. *Hathaway*, 44 id. 521; and it cannot now be maintained that such burden can be imposed on towns, while all the powers necessary for their performance are committed to persons not officers or agents of the town, without holding that the inhabitants of the several towns may be held responsible to the whole extent of their property, for the per-

(formance of every corporate duty, without the power of selecting or controlling the persons who are charged with the performance of such duties.

The legislature has appointed the relators, and has authorized them to perform a town duty respecting a highway. If the legislature may do this, it may appoint the same or other commissioners to perform any or all other town duties. There is no argument which will sustain the former which will not sustain the latter. And if this is the law—that the legislature in this State may take to itself the entire and exclusive government of a town through officers of its own appointment—then this judgment is correct; and if the legislature may not do so, then this judgment is erroneous. Stated broadly and nakedly, the question in this case can be nothing short of this: Is or is not town government in this State a mere privilege conceded by the legislature in its discretion, and one which may be withdrawn at any time at its pleasure? While the majority of the court do not assert so extreme a view, yet the argument of the majority opinion involves the theory of the existence in the legislature of this plenary and sovereign right; and unless such right exists that argument fails.)

It is true that in some decisions the courts of this State have spoken of towns as possessing no inherent, original or reserved powers; but only such powers as have been delegated to them, and which may be regulated and controlled by the legislature. It is from these expressions that the claim is made that towns are nothing but mere agencies which the State employs for the convenience of government, clothing them from time to time with a portion of its sovereignty, but recalling the whole or any part thereof whenever the necessity or the usefulness of the delegation is no longer apparent. In those cases where these expressions have been used, they may not have been inappropriate. In none of them was the actual exercise by the legislature of any such power the subject of the decision. Such expressions, however, are very seldom true in anything more than a general sense. They never are and, in this State, never can be lit-

erally accepted in practice. There are also cases the conclusion in which is not consistent with the existence in the legislature of the power claimed; and one in which the conclusion is antagonistic. *Farrel* v. *Derby*, 58 Conn. 234; *Taylor* v. *Danbury Public Hall Co.*, 35 id. 430; *Burlington* v. *Schwarzman*, 52 id.181.

The people of this State, when they formed the present Constitution, found the whole of its territory occupied by those municipal corporations called towns, each embracing all the inhabitants of a certain portion of the territory. These corporations were governed by their own inhabitants in town meetings, and their affairs were managed by officers chosen by themselves, and who were always inhabitants of the town. And they provided in that instrument that the rights and duties of all corporations should remain as if the Constitution had not been adopted, except so far as therein restricted or limited. Art. X. § 3. They also provided, Art. VI., that electors should only be admitted from the inhabitants of a town, and by the selectmen and town clerk; and by Arts. III. and IV., that meetings by the electors for the choice of State officers should be held in the several towns and carried on by town officers; and by Art. III. that the House of Representatives should consist of representatives from each town, being electors and residents in that town; that town representation should be substantially equal, and that no town should be abolished or deprived of its representation without its own consent; and by Art. X. § 2, that each town should annually elect selectmen, and such other officers of local police, as the laws may prescribe.

(The relation of the towns in this State to the State government, is different from that in other States. Prior to the adoption of the Constitution, the State government consisted mainly of an assembly of delegates from the towns; and those towns had been uniformly treated as entitled to local self-government. While it could not be said that an Act of that assembly vesting the functions of a town meeting, or the duties of selectmen, in a commission appointed by the assembly, would be unconstitutional—strictly there was in

those days no constitution—yet every one familiar with our history knows that such an Act would have been regarded as revolutionary, and that its passage was practically impossible.

This right of the inhabitants of a town to themselves order the municipal duties assigned to the town, was plainly one of those " rights and privileges derived from their ancestors," which the Constitution was adopted " in order more effectually to define, secure, and perpetuate." By the several articles of the Constitution above mentioned, that instrument intended to make sufficient provisions to that end. It did guarantee the perpetual existence of the several towns, with selectmen to manage their local affairs and a town clerk to record their doings at town meetings ; although it left the variety and duties of the officers of the local police subject to legislative change.

In studying these parts of the Constitution, we should always keep in mind that the terms used had a settled meaning before it was adopted. So far as it relates to the form of administration the Constitution is in the main no more than a recognition and re-enactment of an accepted system. The rights preserved are ancient rights, and the municipal bodies recognized in it and required to be perpetuated, were already existing with known elements and functions. And when the Constitution guarantees the perpetual continuance of towns, it means towns with the same essential characteristics which towns at that time exercised ; for if these essential characteristics do not remain, the town as known to the Constitution does not remain. It is the town as it then actually existed, with which the Constitution deals.

Let us, then, ascertain what a town was as then existing. In that way only can we give to these provisions of the Constitution respecting towns, their full and true effect. The form of words by which a town corporation was created, sufficiently appears in a single instance. In the year 1779 Southington was incorporated ; and the record, abbreviated, is that " upon the memorial of the inhabitants of the society of Southington, by their agents shewing that . . . . and pray-

ing to be incorporated into a distinct town, . . . . it was *Resolved by this Assembly,* That the memorialists (*i. e.* the inhabitants of the territory named) with all the lands lying within the following limits and bounds, . . . . be and the same are hereby incorporated into a distinct and separate town, with all the powers and privileges that other towns by law have and do enjoy." 2 State Records, 429. For all the general purposes of municipal administration, the State was divided only into towns. And what the town was, as an actual living entity, is shown by the statutes then in force. Statutes of 1808, Titles: Towns; Town Meetings; Town Clerks; Selectmen, and Highways. The towns were substantially the only territorial subdivisions used. Counties, as municipal corporations or agencies, did not exist. They were the mere territorial limits within which the jurisdiction of the County Courts was exercised, and they were named and designated in connection with the establishment of such courts. 2 Col. Rec. 35. And the courts administered the construction as well as the management of the jails and court houses, as well as the other matters pertaining to the maintenance of such courts. Statutes 1808, Title, Gaols. Counties had no powers except such as were exercised by the courts, and no officers except those appointed by the courts, and a sheriff appointed by the General Assembly. Towns are the only subdivision mentioned in the Constitution, save that the General Assembly is required to appoint a sheriff in each county who shall serve for three years.

These statutes and rules respecting towns were a necessary result from the origin, formation and history of the peculiar form of government in this State. In stating this history, in order to have it as connected as possible, some slight repetition will be made.

In 1633–4 a strong dissent developed in some prevailing notions of government in the infant colony of Massachusetts Bay. The opposition was strongest in the towns of Dorchester, Newtown, and Watertown. In 1631 Watertown had protested against paying a tax assessed by the board of assistants, on the ground that they could not be taxed save

by their own consent. All these towns were foremost in insisting on a general government based on town representation. From these three towns, induced largely by dissatisfaction with the ecclesiastical and centralizing views of the dominant party in the Bay, the pioneers of Connecticut came. By 1636 three towns or plantations were established in Connecticut, and were called Dorchester, Newtown, and Watertown, but shortly after called Windsor, Hartford, and Wethersfield. In March of that year, the General Court of Massachusetts named eight persons " to govern the people at Connecticut for the space of a year." At the end of that year the three towns on their own behalf appointed committees and magistrates who, as a general court, directed the affairs common to the three towns, and so until Jan. 14th, 1638-9. At this time the essential features of town government became fixed and have never since been changed ; they were : a town meeting composed of all the inhabitants exercising all power, an executive board for the general management of town affairs, and a constable for the service of the town warrants and the conduct of the necessary physical force, all chosen by the town meeting.

The " Fundamental Orders " or Constitution of 1639, was a combination and confederation entered into by the inhabitants and residents of Windsor, Hartford, and Wethersfield, " to associate and conjoin ourselves to be as one public state or commonwealth," and to be " guided and governed in our civil affairs," according to such laws as shall be made in the manner provided. The orders provided that each year there should be held two General Courts, composed of deputies from each town chosen by " all that are admitted inhabitants in the towns." To said General Courts was committed the supreme power of the commonwealth, i. e. they only shall have power : 1. to make and repeal laws ; 2. to grant levies for the commonwealth ; 3. to admit freemen (only those already admitted inhabitants by the towns) ; 4. to dispose of lands undisposed of (not belonging to some particular town) ; 5. to discipline either towns or magistrates or any

other person for any misdemeanor, and to " deal in any other matter that concerns the good of the commonwealth."

This power, exclusive and permissive, given to the General Court, developed to the unlimited extent which afterwards characterized it, not so much from this (the 10th order), as from the 8th order which provided that Windsor, Hartford and Wethersfield, should each have power to send four of their freemen as their deputies to every General Court, " which deputies should have the power of the whole town to give their votes and allowance to all such laws and orders as may be for the public good, and unto which the said towns are to be bound." The power which any one of said General Courts might exercise, was unlimited; but the power was that of the several towns exercised by its deputies for the purpose of binding the towns by all laws and orders made for the public good. For this purpose the inhabitants of the towns, as self-governing bodies, did " associate and conjoin themselves to be as one public state or commonwealth," and did " for ourselves and our successors (*i. e.* inhabitants of each town) and such as shall be adjoined to us at any time hereafter (*i. e.* towns hereafter admitted) enter into combination and confederation together," to be governed by such laws as are made in accordance with the fundamental orders. And as a further means by which each town might protect itself against unequal treatment by the confederacy, the final order prohibits the levy of any tax on the towns, unless the amount of the whole tax to be paid by each town is apportioned by a committee consisting of an equal number out of each town. Five years later Farmington was admitted, and the order provided : " They also (the inhabitants) are to have the like liberties as the other towns upon the river, for making orders among themselves." 1 Col. Rec. 134. About the same time Southampton on Long Island was admitted. Owing to its separation by the Sound from the jurisdiction of Connecticut, and the greater difficulties of participating in the doings of the General Court, as well as the doubt whether its inhabitants were included among those subject to the power of the original towns, a formal combination was

negotiated, by which the town of Southampton—as the then river towns had already done—did "by their said deputies, for themselves and their successors, associate and join themselves to the jurisdiction of Connecticut." 1 Col. Rec. 566. In 1662, fortified by the Charter of Charles II. in their claim of jurisdiction, the General Court admitted by simple vote the town of Southold, L. I., and the following year ordered that "Southold shall have and enjoy the same privileges as Southampton doth by virtue of their combination." 1 Col. Rec. 386, 406.

The fundamental orders consummated the union of independent and self-governing bodies for the purposes of their own better government and of extending their jurisdiction. The combination provided for an exercise of power limited only by the fact that the governing body could last but six months, and must consist of deputies from each town clothed with the whole power of the town; but by the very terms of the combination each town must continue a self-governing body; and from that time on the power of local self-government was recognized as necessarily involved in the existence—as well of the original towns who had associated and conjoined themselves to be as one state, as of those described as such towns "as shall be adjoined to us at any time hereafter." The fundamental orders were adopted January 14th, 1638-9. The first General Court was held in May, 1639; the second in September. There was an adjourned meeting of this court held in October; and in this the existing self-governing power of the towns was recognized. " The towns of Hartford, Windsor and Wethersfield, or any other of the towns within this jurisdiction, shall each of them have power to dispose of their own lands undisposed of, . . . . as also to choose their own officers, and make such orders as may be for the well ordering of their own towns, being not repugnant to any law here established." 1 Col. Rec. 36. That this declaration was not regarded as a law necessary to give towns power not before possessed, is certain; because if it were so, such law would have been passed at the first court held in the preceding May, which

held several sessions, or the illegal acts previously passed by
the towns would have been validated; because a law neces-
sary to enable a town to exercise any power, must have been
approved in Ludlow's Code, adopted in 1650; and because
if a law were necessary to enable towns to dispose of their
own property, it was equally necessary to have such a law
to authorize them to establish and define the duties of their
principal officers. Now the office and duty of townsmen
(not known as selectmen until 1691 or later) had been
established in the several towns, with power defined by a
town vote, prior to the adoption of the fundamental orders;
Hartford Town Records, Jan. 1, 1638-9; and these votes
remained unchanged except by town meetings, for many
years afterwards. In fact the towns after, as well as before
the "Constitution" of 1639, conducted by town meeting
their own affairs and chose their own officers, and continued
so to do until the Constitution of 1818; the only interrup-
tion being an edict of Sir Edmund Andros during his brief
usurpation, which strictly defined the duties of selectmen,
and prohibited any town meeting, except the necessary
annual one, for their choice. 3 Col. Rec. 429.

In 1818 the "town" was a territorial and municipal cor-
poration, exercising the rights of local self-government
through a town meeting and officers of its own choosing.
It had existed with these rights from a time prior to the
combination of the first towns under a joint jurisdiction. It
had been continuously the main instrument by which all
the operations of government were set in motion and car-
ried on; and when the provisions of the Constitution speak
of "towns," they speak of that kind of a municipal corpo-
ration whose character, rights and privileges, had been thus
defined and settled for nearly two centuries.

After a struggle of more than thirty years, the General
Assembly yielded to the general demand that the people
have an opportunity to frame a constitution for their own
government; that is, embody in one fundamental plan "their
*supreme original will*, in respect to the organization and per-
petuation of a State government; the division and distribu-

tion of its powers; the officers by whom those powers are to
be exercised; and the limitations necessary to restrain the ac-
tions of each and all for the preservation of the rights, liber-
ties and privileges of all; . . . . to which the legislature,
as well as every other branch of the government, and every
officer in the performance of his duties, must conform."
*Opinion of the Judges,* 30 Conn. 593. For this purpose, in
May 1818, a resolution was passed recommending to the
people to assemble in their respective towns at their usual
place of holding town meetings, and having chosen their
presiding officer, to elect as many delegates as said town
now chooses representatives, to meet in convention in the
following August, and when so convened, if by them
deemed expedient, to "proceed to the formation of a con-
stitution of civil government for the people of this State."
A copy of which constitution, when so formed, was to be
transmitted by said convention forthwith to each town
clerk, to be by him submitted to the voters in his town, as-
sembled at such time as said convention might designate,
for their approbation and ratification. Said constitution,
"when ratified and approved by such majority of said quali-
fied voters convened as aforesaid as shall be directed by said
convention, shall be and remain the supreme law of this
State." Journal of Const. Conv. p. 5. The committee
which framed this resolution, in their report say, that "from
resolutions adopted in many towns, and petitions from . . . .
citizens in others," they can entertain no doubt of a general
manifestation of a desire for "the establishment of a Consti-
tutional Compact;" and that the political happiness hereto-
fore enjoyed "is to be ascribed to other causes, rather than
to any peculiar intrinsic excellence in the form and character
of the government itself. Destitute of fundamental laws
defining and limiting the powers of the legislature, the citi-
zen has no security against encroachments on his most sacred
rights, and violations of the first principles of a free govern-
ment, except what may be found in the dependence of that
body on the frequency of popular elections. Yet even these
boasted barriers against arbitrary power may at any time be

prostrated by the legislative will." J. H. Trumbull's Notes on Const. of Conn. 43.

Upon the ratification by a majority of the people of the State, of the Constitution formed by the delegates from each town appointed for that purpose in town meetings, the former government by General Assembly was finally and forever dissolved. The people in the exercise of their sovereignty, established a new government in their separate and independent departments, whose powers were to be exercised and exercised only, in accordance with their "supreme original will embodied in the constitution." As declared in its preamble, the main object in establishing this Constitution by the people, was " in order more effectually to define, secure, and perpetuate the liberties, rights and privileges which they have derived from their ancestors." This purpose was accomplished, first by the declaration of certain principles of free government, which were made a fundamental condition on which all powers to each department of government were granted; and second, by incorporating into the framework of the government established, such provisions as were deemed apt and necessary to preserve the most essential of their ancient privileges. Among these the one cherished above all others was the right and privilege of local self-government as represented in the towns, the town meeting, and the town officers. The town was the germ from which all government in Connecticut has developed; and under the Constitution, as this court has recently said, " the annual town election is the single entrance to our whole system of State government." O'Flaherty v. Bridgeport, 64 Conn. 165. Through all its history it had played the most conspicuous part; with all the arbitrary power from time to time exercised by the General Court, the ordering of town affairs through its own officers had never been disturbed.) The suppression of the town meeting was associated with tyranny under the usurpation of Andros, and its maintenance was by common consent deemed both the source and protection of that sturdy independence and respect for law which had ever characterized our people. It was to be expected that when the delegates

from the towns met in convention to form a constitution that should perpetuate their ancient rights and privileges, a local self-government would not fail to be secured; and so we find this principle embodied in the whole frame-work of the new government.

When Art. VIII. provides that electors should only be admitted from the inhabitants of a town and by the select-men and town clerk of the several towns, the perpetual existence of the several towns with an executive board to manage their affairs and a town clerk to record the doings at town meetings, is guaranteed. The same is true when Art. III. prohibits any meeting of the electors for the choice of State officers, except in the towns and when carried on only by town officers; and the same article, in providing that the House of Representatives should consist of representatives from each town, being electors residing in that town, and that town representation shall be substantially equal, and that no town should be abolished or deprived of its representation without its consent,—not only established a legislative department where the people, as corporators of town corporations are represented in the lower branch, and as individuals in the upper branch, but guaranteed the right and privilege in the inhabitants of each town to remain so long as they will a town corporation.

The legislature may regulate the conduct of the town corporation, may determine the local duties to be assigned to them—and in that sense the towns derive their powers from the legislature,—but the possession of some local duties and powers, the administration of such duties by themselves or their own officers, is inherent in the towns which the Constitution makes the basis of the new government, and the legislature has no power to destroy this town. The Constitution assumes the existence of towns as local municipalities, and contemplates that they shall continue as they have hitherto been. It does not expressly provide that every portion of the State shall have a town organization. It names certain officers who are to be chosen by the inhabitants of the towns, and confers on the inhabitants the right to choose these officers;

but it does not define their duties, nor preclude the legislature from establishing new officers, and giving the incumbents the general management of the municipal affairs. If, therefore, there are no restraints imposed upon the legislative discretion beyond those specifically stated, the towns of this State might be abolished and their people subjected to the rule of commissioners appointed at the State Capitol. The people of these towns might be kept in a sort of pupilage for any period of time, or to any extent the legislature might choose. And it assumes either an intention that the legislative control should be constant and absolute, or on the other hand that there are certain fundamental principles in our general frame-work of government, which were within the contemplation of the people when they agreed upon the Constitution, subject to which the delegation of authority to the several departments of government was made. That this last is the case, appears too plain for serious controversy. The implied restriction upon the power of the legislature as regards local governments, though their limits may not be as plainly defined as express provisions might have made them, are nevertheless equally imperative in character, and whenever a question arises that is clearly within them, there is no alternative but to bow to their authority.

Article X., in providing that each town shall annually elect selectmen and such officers of local police as the laws may prescribe, guarantees the management of town affairs by town officers of their own choice. By directing the selectmen, the more modern name for the ancient townsmen,—to whom had been committed the important affairs of the town since the first settlement of the river towns,—to be elected by each town annually, the direction that all officers and agents of the town shall derive their appointment from the town, is affirmed by an implication so absolute as not to be escaped. Otherwise every officer and agent of the town, except selectmen and the local police prescribed by law, may be appointed by the legislature. The town clerk is certainly not a selectman; if he is an officer of local police he is not such an one "as the laws may prescribe;" his title comes directly from

the Constitution; yet no one would have the hardihood to claim that the next legislature may appoint every town clerk for a term of twenty years. The selectmen must be elected by the towns annually, because they are the ordinary and permanent agents of the town; and unless this provision means that all these agents must derive their authority from the town, then the legislature may direct that the town duties appertaining to selectmen, as well as every function of a town, shall be performed by special town agents to be appointed by the legislature. I do not understand the majority of the court to justify such legislation; plainly it would be void, but it would be void only because the Constitution, in placing a town beyond the power of the legislature to destroy, takes under its protection the right—without which the towns of the Constitution cease to be municipal corporations and become something unknown to our laws—of self-government through its own officers and agents, in all those matters included by law within its municipal powers and duties.

This right of local self-government is assured by the provisions of Arts. III. VI. and X. of the Constitution. It enters into the whole frame-work of the government; because of its existence, the continuance of the body of electors, the election of State officers, the constitution of the House of Representatives, were made dependent on the towns and subject to the specific provisions mentioned. A guaranty so bulwarked should be more potent than any naked restriction. When the Bill of Rights forbids the taking of private property for public use without compensation, it forbids the taking of such property for any but a public use; and the guaranty implied is not less sacred than the guaranty expressed.

When, therefore, the legislature having included within the municipal duties of Glastonbury and the four other towns named, the maintenance of the highway described, it could not appoint the agents who on behalf of the town were to exercise those duties and powers. "The theory of the Constitution is, that the several . . . . towns . . . . are, of right, entitled to choose whom they will have to rule over them;

and that this right cannot be taken from them and the electors and inhabitants disfranchised by any act of the legislature, or of any or all of the departments of the State government combined." *The People ex rel. Bolton* v. *Albertson,* 55 N. Y. 50, 56. " Local self-government having always been a part of the American and English systems, we shall look for its recognition in any such instrument. And even if not expressly recognized, it is still to be understood that all these instruments are framed with its present existence and anticipated continuance in view. Cooley, Const. Lim. (6th Ed.) 47 ; *The People* v. *Hurlbut,* 24 Mich. 44 ; *Park Commrs.* v. *Detroit,* 28 id. 228 ; *The People ex rel. McCagg* v. *Chicago,* 51 Ill. 17. " The right of local self-government cannot be taken away, because all our constitutions assume its continuance as an undoubted right of the people, and as an incident to republican government." Cooley, Const. Lim. (6th Ed.) 207. " In the examination of American constitutional law, we shall not fail to notice the care taken and the means adopted to bring the agencies by which power is to be exercised as near as possible to the subject upon which the power is to operate. In contradistinction to the governments where power is concentrated in one man, or one or more bodies of men, whose supervision and active control extends to all the objects of government within the territorial limits of the State, the American system is one of complete *decentralization,* the primary and vital idea of which is, that local affairs shall be managed by local authorities, and general affairs only by the central authority." Cooley, Const. Lim. (6th Ed.) 223 ; Ordronaux, Const. Legis. 62.

This opinion has been drawn out further than was intended. The question of local self-government, as an ingredient essential to constitutional administration, has been set forth so clearly in the language of JUDGE COOLEY, in *People* v. *Hurlbut,* 24 Mich. 44, 105, already cited—a case in which the legislature had undertaken to appoint commissioners to govern the city of Detroit—that I quote the passage in full. After reviewing the history of local and municipal government in various States, he said:—

" In view of these historical facts, and of these general principles, the question recurs whether our State Constitution can be so construed as to confer upon the legislature the power to appoint for the municipalities, the officers who are to manage the property, interests, and rights in which their own people alone are concerned.   If it can be, it involves these consequences: As there is no provision requiring the legislative interference to be upon any general system, it can and may be partial and purely arbitrary.   As there is nothing requiring the persons appointed to be citizens of the locality, they can and may be sent in from abroad, and it is not a remote possibility that self-government of towns may make way for a government by such influences as can force themselves upon the legislative notice. . . . As the municipal corporation will have no control, except such as the State may voluntarily give it, as regards the taxes to be levied, the buildings to be constructed, the pavements to be laid, the conveniences to be supplied, it is inevitable that parties, from mere personal considerations, shall seek the offices, and endeavor to secure from the appointing body, whose members in general are not to feel the burden, a compensation such as would not be awarded by the people, who must bear it, though the chief tie binding them to the interests of the people governed might be the salaries paid on the one side and drawn on the other.   As the legislature could not be compelled to regard the local political sentiments in their choice, and would, in fact, be most likely to interfere when that sentiment was adverse to their own, the government of cities might be taken to itself by the party for the time being in power, and municipal governments might easily and naturally become the spoils of party, as State and National offices unfortunately are now.   All these things are not only possible, but entirely within the range of probability, if the positions assumed on behalf of the State are tenable.   It may be said that these would be mere abuses of power, such as may creep in under any system of constitutional freedom; but what is constitutional freedom?   Has the administration of equal laws by magistrates

freely chosen no necessary place in it?  Constitutional free-
dom certainly does not consist in exemption from govern-
mental interference in the citizen's private affairs ; in his
being unmolested in his family, suffered to buy, sell and
enjoy property, and generally to seek happiness in his own
way.  All this might be permitted by the most arbitrary
ruler, even though he allowed his subjects no degree of
political liberty.  The government of an oligarchy may be
as just, as regardful of private rights, and as little burden-
some as any other ; but if it were sought to establish such a
government over our cities by law, it would hardly do to
call upon a protesting people to show where in the constitu-
tion the power to establish was prohibited ; it would be
necessary, on the other hand, to point out to them where
and by what unguarded words the power had been conferred.
Some things are too plain to be written.  If this charter of
State government which we call a constitution, were all
there was of constitutional command ; if the usages, the cus-
toms, the maxims, that have sprung from the habits of life,
modes of thought, methods of trying facts by the neighbor-
hood, and mutual responsibility in neighborhood interests,
the precepts which have come from the revolutions which
overturned tyrannies, the sentiments of manly independence
and self-control which impelled our ancestors to summon the
local community to redress local evils, instead of relying
upon king or legislature at a distance to do so,—if a recogni-
tion of all these were to be stricken from the body of our
constitutional law, a lifeless skeleton might remain, but the
living spirit, that which gives it force and attraction, which
makes it valuable and draws to it the affections of the people,
that which distinguishes it from the numberless constitu-
tions, so called, which in Europe have been set up and
thrown down within the last hundred years, many of which,
in their expressions, have seemed equally fair and to possess
equal promise with ours, and have only been wanting in the
support and vitality which these alone can give,—this living
and breathing spirit, which supplies the interpretation of the
words of the written charter, would be utterly lost and gone.

" MR. JUSTICE STORY has well shown that constitutional freedom means something more than liberty permitted; it consists in the civil and political rights which are absolutely guaran ied, assured and guarded; in one's liberties as a man and a citizen,—his right to vote, his right to hold office, his right to worship God according to the dictates of his own conscience, his equality with all others who are his fellow-citizens; all these guarded and protected, and not held at the mercy and discretion of any one man or of any popular majority.—*Story, Miscellaneous Writings*, 620. If these are not now the absolute right of the people of this State, they may be allowed more liberty of action and more privileges, but they are little nearer to constitutional freedom than Europe was when an imperial city sent out consuls to govern it. (The men who framed our institutions have not so understood the facts. With them it has been an axiom, that our system was one of checks and balances; that each department of government was a check upon the others, and each grade of government upon the rest; and they have never questioned or doubted that the corporators in each municipality were exercising their franchises under the protection of certain fundamental principles which no power in the State could override or disregard. The State may mould local institutions according to its views of policy or expediency; but local government is matter of absolute right; and the State cannot take it away. It would be the boldest mockery to speak of a city as possessing municipal liberty where the State not only shaped its government, but at discretion sent its own agents to administer it; or to call that system one of constitutional freedom under which it should be equally admissible to allow the people full control of their local affairs, or no control at all."

In this State we are not obliged to invoke the underlying principle of American constitutional law, in order to protect the inhabitants of our towns in their right to local self-government; the express provisions and necessary implications of our own Constitution plainly guarantee that right. Therefore the Private Act by which the legislature under-

took to appoint these relators to execute the powers and per-
form the duties committed by the Public Act to the town of
Glastonbury and the four other towns, as town corporations,
violates a clear mandate of the Constitution, and to that
extent is void.

I think there is error in the judgment of the Superior
Court.

HAMERSLEY, J. (dissenting).   I dissent from the decision
of a majority of my colleagues, and cannot but believe that a
different conclusion would have been reached, had it seemed
to them as clear as it seems to me, that the legislation in
question necessarily involves the appointment of the relators
by the legislature, not as State officers but as town officers,
not to perform duties directly in behalf of the State, but du-
ties by the very terms of the statute assigned to the towns as
the local municipal duties of a town corporation.

I dissent from the opinion as announced by JUDGE BALD-
WIN, and concur in the opinion of CHIEF JUSTICE ANDREWS.