[Civ. No. 2277. Second Appellate District.—March 17, 1917.]

## C. F. VAN DE WATER, Petitioner, v. R. W. PRIDHAM et al., as Constituting the Board of Supervisors of Los Angeles County, Respondents.

DRAINAGE ACT—DISPOSITION OF BONDS—CONSTRUCTION OF ACT—RE-PUGNANCY OF PROVISIONS.—The act of the legislature entitled "An act to promote the drainage of wet, swamp, and overflowed lands, and to promote the public health in the communities in which they lie," approved March 21, 1903 (Stats. 1903, p. 354), as amended in 1915 (Stats. 1915, p. 359), is not invalid because of the repugnancy exist- ing between sections 8d and 8e, as to the disposition to be made of the bonds to be issued by the county to represent the cost of the work, when the language of the whole act is considered, as upon such a con- sideration it is apparent that it was the intent of the legislature that payment for the work should be in bonds equal to the amount of the contractor's bid, plus such sum as he, under all the require- ments of the act, should advance in payment of all incidental ex- penses connected with the work, delivered by the treasurer to the contractor or his assignees as provided by section 8d, and not that they should be sold by the board of supervisors as provided by section 8e.

ID.—CONSTRUCTION OF DRAINAGE CANAL THROUGH STREETS OF MUNICI- PALITY — CONSENT OF CORPORATION—VALIDITY OF ORDINANCE.—A municipal corporation operating under a freeholders' charter, which vests in the city plenary control of all uses of its streets, has the power to enact an ordinance giving the board of supervisors of a drainage district permission to construct a drainage canal through certain specified streets; and without regard to the character of the charter, the consent of the legislative body of the city is a pre- requisite condition to extending the drainage canal through the streets of the municipality.

ID.—CONSTRUCTION OF DITCH THROUGH CITY STREETS—CONSENT UPON TERMS—VALID ORDINANCE.—An ordinance granting consent of a

municipal corporation to the construction of a drainage ditch through its streets is not rendered a nullity by reason of the fact that such consent was upon certain terms named in the ordinance, which were protective of public interest, germane to the subject, and violative of no provision of the Drainage District Act.

ID.—DOING OF WORK—PUBLIC BENEFIT—SILENCE OF STATUTE—VALIDITY NOT AFFECTED BY.—The Drainage Act of 1903 is not void by reason of its failure to provide in direct terms that the doing of the work shall depend upon its being a public benefit, in view of section 4 of the act which makes the determination of the board to proceed with the hearing therein referred to presumptive evidence of the existence of all facts upon which the power of the board to proceed depends.

ID.—LOS ANGELES COUNTY FLOOD CONTROL ACT—DRAINAGE ACT NOT SUPERSEDED BY.—The Drainage Act of 1903 has not been superseded in Los Angeles County by the act of 1915 entitled "An act to create a flood control district, to be called 'Los Angeles county flood control district,'" (Stats. 1915, p. 1502), as the purpose of the Drainage Act is to dispose of the water and get rid of it as an injurious element, while the purpose of the County Flood Control Act is to conserve the water as a beneficial agent.

APPLICATION for a Writ of Review originally made to the District Court of Appeal for the Second Appellate District to review proceedings creating and establishing a drainage district.

The facts are stated in the opinion of the court.

A. J. Sherer, and Robert Young, for Petitioner.

A. J. Hill, County Counsel, and Charles E. Haas, Deputy County Counsel, for Respondents.

Ostrander, Clark & Carey, and John Outcalt, *Amici Curiae.*

SHAW, J.—*Certiorari.* The board of supervisors of Los Angeles County, claiming authority so to do under and by virtue of the provisions of a certain act of the legislature entitled, "An act to promote the drainage of wet, swamp and overflowed lands, and to promote the public health in the communities in which they lie," approved March 21, 1903 (Stats. 1903, p. 354), the title to which and the act were amended in 1915 (Stats. 1915, p. 359), in a proceeding instituted therefor

by petition, created and established a drainage district designated as "Los Angeles County Drainage District No. 1," the boundaries of which embrace certain territory in the city of Long Beach. When the proceedings had progressed to a point where the contract for constructing the drainage improvement had been awarded for the doing of the work and contract therefor executed, petitioner, as an owner of land in the district, brought this proceeding attacking the proceedings as in excess of the jurisdiction of the board. Petitioner asserts that the law under which the board of supervisors assumed to act is invalid, and hence the proceedings so had and thereunder taken by the board of supervisors for the formation of the district, award of contract for the doing of the work therein, and providing for the payment of the cost thereof by bonds issued for and on behalf of the district to the contractor for the cost of the work, were had and taken without authority of law.

This contention is based upon the following grounds: First. That there is an irreconcilable contradiction between the different sections of the Drainage Act relative to the disposition to be made of the bonds to be issued by the county to represent the cost of the proposed work. Second. That the inclusion of part of the city of Long Beach within the proposed drainage district, is unauthorized by law. Third. That the Drainage Act under which the proceedings were taken is wanting in any provision which restricts the power of the board acting thereunder to cases where the improvement would constitute a public benefit. Fourth. That the act has been superseded in Los Angeles County by a subsequent act adopted by the legislature, known as the "Los Angeles County Flood Control Act." We will discuss the points made by petitioner in the order in which they are presented in his brief.

1. To meet the cost of the formation of the district and the proposed improvement therein, the act provides for the issuance of bonds in form as prescribed. Section 8c of the act provides that if, upon a hearing had in accordance with section 8b, the board is of the opinion that the work contracted for has been completed, it shall by a resolution so declare and accept the work, and state therein "the aggregate amount for which bonds shall be issued, and . . . the amount of the incidental costs and expenses of the work and the proceeding which are charged against and to be paid by the contractor,"

as provided in section 8g.  Section 8d requires the clerk to transmit a copy of the order so made by the board of supervisors to the county treasurer, upon receipt of which such officer is required to issue bonds in the amount fixed by said board in said order; which bonds are to be signed by the presiding officer of the board and the county treasurer, and when so signed, *"said bonds shall be delivered by said treasurer to said contractor or to his order, assignee or lawful representative."*  Section 8e provides for the raising of a fund by special tax for the discharge and payment of the bonds and the interest thereon as the same become due, and to maintain and keep the works in repair, followed by the provision: *"And the board of supervisors is hereby vested with the power and it is the duty of said board to advertise said bonds for the sale by at least one insertion of a notice of sale in a newspaper of general circulation within the county and to sell said bonds to the highest responsible bidder, and to do all and singular the things necessary for the purpose of selling said bonds and which in this section aforesaid it is declared shall be done."*  It thus appears that the act contains two provisions touching the disposition of the bonds, which are wholly repugnant.  It is impossible to give effect to both, for it is apparent that if the treasurer be required by the provision contained in section 8d to deliver them to the *contractor or to his order, assignee or lawful representative,* as payment for doing the work, it must necessarily render the provision for the sale thereof, contained in section 8e, wholly inoperative.  Throughout the proceeding the board of supervisors acted upon the theory that the cost of the work and expenses incidental thereto should be paid for, not from the proceeds of the sale of bonds to be issued for and on behalf of the district, but in bonds issued and delivered directly to the contractor, who was required to advance all sums necessary to cover surveys, inspection, and incidental expenses.  The contention of petitioner is that, since the conflict between the two provisions is so complete as to leave no possible room for giving effect to both, the one last in numerical order must prevail (*Turner* v. *Wilson,* 171 Cal. 600, [154 Pac. 2]), and this, indeed, is the provision of section 4484 of the Political Code, to which, however, must be added the qualification therein provided, *"unless such construction is inconsistent with the meaning of such chapter or article";* in which case the rule of interpretation is that the

court should look to the language of the whole act and if it
finds in any particular clause an expression not consistent in
its import with those used in other parts of the same statute
and not in harmony with its plan, purpose, and scope, and if
by taking a view of the whole act it can collect from such
larger and more extensive expressions the real intention of
the legislature, it is its duty to give effect to that intention.
(*State* v. *Jennings*, 27 Ark. 419; *Torrance* v. *McDougald*, 12
Ga. 526; *Mason* v. *Finch*, 2 Scam. (Ill.) 223; *In re Vander-
berg*, 28 Kan. 173; *Pond* v. *Maddox*, 38 Cal. 572.)    Applying
this rule, we have no difficulty in reaching the conclusion that
it was the intent of the legislature that payment for the work
should be in bonds in a sum equal to the amount of the con-
tractor's bid, plus such sum as he, under the requirements of
the act, should advance in payment of all incidental expenses
connected with the work, delivered by the treasurer to the
contractor or his assignees.   So construed the act provides a
complete scheme for the financial administration of the under-
taking, while the provision for sale as a means for such ad-
ministration is incomplete and uncertain as to acts necessary
to accomplish the purpose of the law.   Among other provi-
sions contained in the act which support the interpretation
given, are those found in section 8g, which provides that "All
the costs and expenses of the proceeding, inclusive especially
of the compensation of the person appointed to furnish the
specifications, of the superintendent of work, of the engineer
of work, of the cost of all publications under this act required
to be made, shall be chargeable to and paid by the contractor,
and they shall have been paid before delivery of the bonds
shall be made by the county treasurer; *provided, however,*
that the county treasurer may make delivery of such bonds, if
there be deposited with him, subject to the order of the board
of supervisors, money to the amount of the costs and expenses
chargeable to the contractor as the same is stated in the
attested order of the board of supervisors, provided for in sec-
tion 8d of this act.   The contractor and all persons claiming
under him any interest in said bonds, whether of ownership,
lien or otherwise, shall be deemed to have notice of the con-
tents of this section."   The provisions of this section, later
in numerical order than 8e, could have no reference to the
sale of the bonds provided for in said last-mentioned section,
but unquestionably refer to the conditions under which the

treasurer shall deliver the bonds to the contractor or upon his order or to his assignees, in which case the latter shall take notice of the provisions of the section as to the payments so required to be made by the contractor as a condition of having the bonds *claimed by him,* which shall represent the *total cost of the work* (sec. 8b), delivered to him by the treasurer (sec. 8d), for the *cost of the work.*

2. Section 1½ of the act provides: "Whenever a portion of any ditch or drain or system of ditches or drains for the drainage of any such body of wet, swamp, or overflowed lands passes through or forms the boundary line of any municipal corporation, or where adjacent territory within such municipality is found by said board of supervisors to be benefited by such work or improvement, such adjacent territory may be included within the boundaries of such drainage district in proceedings instituted for the creation of said drainage district; *provided,* said petitioners first obtain the consent of the governing body of such municipality, expressed by ordinance, to the construction of such ditch or drain or ditches or drains within the limits of such municipality, and thereupon all such territory shall be subject to the provisions of this act, and any work of any improvement herein contemplated to be done may be done either within or without the boundaries of the district organized therefor as may be necessary to properly drain by a ditch or drain or a system of ditches or drains any body of wet, swamp or overflowed lands within said district." Incorporated within the boundaries of the proposed district were certain lands located within the city of Long Beach through which the proposed drainage canal was to extend. Under the authority of said section 1½ of the act, the board of supervisors sought and obtained from the legislative body of the municipality its consent and permission, expressed by ordinance, to the construction of the drainage canal through certain specified streets of said city. Notwithstanding this ordinance, which contained conditions upon which the consent was made, petitioner insists, first, that the legislative body of said city of Long Beach, operating under a freeholders' charter, was without power to make the grant of such use; and, second, that the attaching of conditions to such consent rendered it null and of no effect. The want of power to consent to the construction of the works through the streets of the city to an outfall emptying into the ocean, is

33 Cal. App.—17

based upon the contention that such use thereof confers upon the district control of the streets, which is violative of the provisions of the charter vesting in the city "plenary control of all uses of its streets," together with all matters of internal sanitation; that hence the work proposed to be done by the district is a municipal affair as to which the freeholders' charter under which the city is operating is the controlling law. (Const., art. XI, sec. 6; *Fritz* v. *San Francisco,* 132 Cal. 373, [64 Pac. 566]; *Barber Asphalt Pav. Co.* v. *Costa,* 171 Cal. 138, [152 Pac. 298].) In our opinion, the control of its streets, which under its freeholders' charter the city of Long Beach exercises over its streets, does not differ from that exercised by cities of the state operating under the general law. The act recognizes the right of such control in all municipalities, whether created under general law or operating under charter adopted pursuant to the constitution. Without regard to the character of the charter, the consent of the legislative body of the city is a prerequisite condition to extending the drainage canal through the streets of the municipality. It has been repeatedly held that the legislature may provide for the creation of districts such as that here involved and for the financial administration of their affairs, which include lands in municipalities. (*Board of Directors of Modesto Irr. Dist.* v. *Tregea,* 88 Cal. 334, [26 Pac. 237]; *La Mesa Homes Co.* v. *La Mesa etc. Irr. Dist.,* 173 Cal. 121, [159 Pac. 593]; *In re Madera Irr. Dist.,* 92 Cal. 297, [27 Am. St. Rep. 106, 14 L. R. A. 755, 28 Pac. 272, 675].) In the case last cited the question involved was that of including a part of a municipality in an irrigation district, and it was there said: "Neither is it in violation of the constitution to incorporate into such district a town or city that has been incorporated for other municipal purposes. A system of irrigation contemplated by the act in question cannot be considered as a municipal purpose within the scope of the organization of a city or town, and there can be no conflict between a corporation organized under the act to produce a system of irrigation within the district, and the municipal incorporation of the town of Madera." So in the case at bar, the construction of a drainage system for the purpose of draining swamp and overflowed lands adjacent to Long Beach, although the drainage ditches extend through the streets of such city, cannot be deemed a municipal affair. Since the conditions existing, as

where the lands are outside the city limits, or inclusive of lands both in and outside thereof, it becomes a matter of more than local concern.  In the case of *Pixley* v. *Saunders,* 168 Cal. 152, [141 Pac. 815], where a like question was involved, the supreme court said (quoting from the syllabus) : ''While generally the question of sanitation is a municipal affair, in 'many instances it is one of broader scope, which cannot be adequately handled by the municipal authorities of a single town.  Therefore it cannot be said to be a local or municipal affair within the inhibition of sections 12 and 13 of article XI of the constitution, but it falls within the class of public purposes for which the legislature has the authority to provide governmental agencies or districts by general laws.''

In our opinion, there is no merit in petitioner's claim that the ordinance granting consent of the city of Long Beach to the construction of the drainage ditch through its streets is a nullity by reason of the fact that such consent is upon certain terms named in the ordinance.  The conditions attached are terms protective of the public interest, germane to the subject, and violative of no provision or principle of the Drainage District Act; indeed, without being attached to the ordinance, they might be and, for aught that appears to the contrary, are incorporated into the specifications for the construction of the ditch through the streets of the city.  At all events, since the city might, at its option, deny the use of its streets for the purpose of constructing the canals therein, it could attach any condition, not in conflict with the conditions of the act, which was germane to the subject and calculated to protect the public interest in the streets, thus exercising plenary control over the streets.  A similar question arose in the case of *Lake* v. *Ocean City,* 62 N. J. L. 160, [41 Atl. 427], where it is said: ''It has been generally understood that a municipality that may lawfully consent to the formation of a private corporation for certain public purposes may lawfully condition its consent upon terms protective of such public interests, and germane to the subject.  If the persons upon whom the stipulations impose terms do not complain, it is difficult to see how others are affected otherwise than beneficially.''  It is optional on the part of the city whether or not it grant the use thereof for such purpose at all, and likewise optional with the district whether or not it accepts other than an unrestricted grant of such use.  We perceive no legal objection, however, to the dis-

trict accepting a conditional grant of the use of the streets where the terms imposed are not inconsistent with the purposes of the act and which it might adopt in doing the work (*Forest City Ry. Co.* v. *Day,* 73 Ohio St. 83, [76 N. E. 396]), in the absence of such imposed conditions.

3. Section 1 of the act provides for the initiation of the proceeding by filing with the board of supervisors a petition defining the boundaries of the proposed district to be benefited by the construction of the improvement, upon which, after notice given, a hearing is had upon objections filed as provided in said section. While not in express terms authorizing the board to deny the petition, such power to deny, modify, or change, we think, must be deemed implied from the provision of section 5, that "at the conclusion of the hearing, the determinations of the board shall be made in writing to be filed and entered upon the minutes of the board." Nor, in our opinion, is the act subject to the objection that it is void by reason of its failure to provide that the doing of the work shall depend upon its being a public benefit. True, it does not require in direct terms a finding on the part of the board that it shall be a public benefit, though the record discloses that the board did find that the public interest and convenience would be subserved by the doing of the work. In Page and Jones on Taxation by Assessment, section 334, it is said: "Possibly the special and local benefit is clearer in drainage than it is in any other of the public improvements for which assessments are levied. The improvements of drainage, and its beneficial effect upon the land drained are matters of general knowledge which have often been commented upon by the courts." And again (sec. 335): "If land in its natural condition is generally or often covered with stagnant water it is likely to be a menace to public health. . . . Under these circumstances there is no doubt that the drainage of such land, by artificial means, is an improvement which confers a benefit upon the public at large." The supreme court of this state, in the case of *Hagar* v. *Board of Supervisors,* 47 Cal. 222, in discussing the validity of the Drainage Act of 1868, said: "But we think the power of the legislature to compel local improvements, which, in its judgment, will promote the health of the people, and advance the public good, is unquestionable. In the exercise of this power it may abate nuisances, construct and repair highways, open canals for irrigating arid districts, and

perform many other similar acts for the public good, and all at the expense of those who are to be chiefly and more immediately benefited by the improvement.'' In Lewis on Eminent Domain, second edition, volume 1, section 188, it is said: ''The promotion of the public health is undoubtedly a public use within the meaning of the constitution, and private property may be taken for the construction of drains, levees or other works in order to accomplish this object.'' (See, also, *Laguna Drainage District* v. *Charles Martin Co.,* 144 Cal. 209, [77 Pac. 933].) The power of the legislature to authorize the doing of the work at the expense of those owning swamp and wet lands who are chiefly benefited by the improvement, is, as we understand the law, founded, like municipal sanitation measures, not only upon its power to do all things necessary to conserve the health and general welfare of the public, but statutes authorizing drainage of swamp-lands are upheld independently of any effect upon the public health as reasonable regulations for the benefit of those who are deemed owners of a common property. (*Fallbrook Irr. Dist.* v. *Bradley,* 164 U. S. 112, [41 L. Ed. 369, 17 Sup. Ct. Rep. 56], and cases cited.) And hence the power to act does not depend upon any express provision contained in the act that the board of supervisors shall first determine that it is necessary for the public welfare. Moreover, section 4 of the act makes the determination of the board to proceed with the hearing therein referred to presumptive evidence of the existence of all facts upon which the power of the board to proceed depends.

4. Petitioner suggests that the act in question has been superseded, in so far as Los Angeles County is concerned, by ''An act to create a flood control district, to be called 'Los Angeles county flood control district.' '' (Stats. 1915, p. 1502.) We are unable to perceive any merit whatsoever in this contention, and agree with counsel for petitioner that ''there is a radical difference between the purposes of the drainage act involved in this action and the said Los Angeles county flood control act. The purpose of the drainage act is to dispose of the water and get rid of it as an injurious element; while the purpose of the Los Angeles county flood control act is to conserve it as a beneficial agent.'' The purpose of one is ''to promote the drainage of wet, swamp or overflowed lands''; the other, as declared by the first paragraph of section 2, is ''to provide for the control of the flood and

storm waters of said district [which embraces practically the entire county of Los Angeles], and to conserve such waters for beneficial and useful purposes by spreading, storing, retaining or causing to percolate into the soil within said district.'' The fact that in the proceedings mention is made of the proposed drainage ditch as the ''construction of a storm drain,'' which purpose it might at times serve, is in no wise inconsistent with the purpose declared in the act itself. Certainly it was not the intent of the legislature that by creating a flood control district, embracing almost the entire county of Los Angeles, such act should repeal all provisions for the drainage of wet and swamp lands in the county, any more than by the act under which irrigation districts are created it was intended to destroy all acts providing for the drainage of swamp-lands embraced within such irrigation districts.

While the act is loosely drawn, nevertheless its purpose is clear, and we have reached the conclusion, not without some difficulty, however, that taken as a whole, it affords a means for effecting such purpose, the validity of which is not subject to attack upon the specific grounds urged by petitioner.

It is therefore ordered that the proceedings be affirmed.

Conrey, P. J., and James, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 16, 1917.