[Civ. No. 4776.  Second Appellate District, Division Two.—October 23, 1924.]

## PETER R. GADD, Petitioner, v. HUGH J. McGUIRE et al., Respondents.

[1] MUNICIPAL CORPORATIONS — LOS ANGELES — PUBLIC IMPROVEMENTS UNDER GENERAL LAWS—CONSTRUCTION OF FREEHOLDERS' CHARTER. By the provision in the freeholders' charter of the city of Los Angeles declaring that the authority therein granted to make street improvements, etc., shall be "supplemental, additional and alternative powers to those conferred upon municipalities by the general laws of the state of California," there is conferred upon the city authorities the right to elect either to exercise the powers which are expressly granted to the city by its charter, and to proceed as therein provided, or to exercise those powers which are granted to all the municipalities of the state by general laws, and to proceed as in those laws prescribed.

[2] ID. — MUNICIPAL AFFAIRS — PUBLIC IMPROVEMENT EXTENDING BEYOND CITY BOUNDARY.—An improvement may not be said to be a "municipal affair," within the meaning of section 6 of article XI of the state constitution, if it is not of special concern to the inhabitants of, or to the owners of property in, the particular city or town, or to the inhabitants of, or owners of property in, some portion of such city or town, simply as such inhabitants or property owners; and where an improvement is of general concern to the inhabitants and property owners of a city or town, or a portion of a city or town, in common with inhabitants or property owners of the state at large, or a portion of the state outside of such city or town, it is not a purely "municipal affair," as those words are used by our organic law.

[3] ID.—IMPROVEMENTS AFFECTING ADJOINING MUNICIPAL UNITS—MUNICIPAL AFFAIRS—APPLICATION OF CITY BOUNDARY LINE ACT.—By the City Boundary Line Act (Stats. 1911, p. 1018), and the amendments thereof, a county and one or more cities or towns may unite for the common benefit of all the interested inhabitants or property owners within the improvement district for the purpose of effecting an improvement which does not lie wholly within any one city or town and which does not concern alone or especially the inhabitants or property owners of any one city or town, and in this way there may be accomplished what it would be impossible for any one of the municipal agencies jointly engaged in the common enterprise alone to achieve, and for the purpose of paying the expense of such an improvement an assessment district may be formed which, like the improvement itself, lies partly within and partly without

---

2. See 18 Cal. Jur. 785.

each of the constituent municipal units jointly engaged in the common undertaking, and for these reasons the improvement, while in a certain sense partaking of the characteristics of a municipal affair, in that municipalities are interested therein, is essentially much more than a municipal affair.

[4] ID.—CITY BOUNDARY LINE ACT—MUNICIPAL AFFAIRS—CONSTITU-TIONAL LAW.—Improvements authorized by the City Boundary Line Act (Stats. 1911, p. 1018) are not "municipal affairs," and that act does no violence to the rights reserved to chartered municipalities by section 6 of article XI of the state constitution.

[5] ID.—ASSESSMENT TO DEFRAY COST—NATURE OF TAX—CONSTITU-TIONAL LAW.—Even if the assessment which the city Boundary Line Act (Stats. 1911, p. 1018) authorizes may be deemed to be taxes, and as that word is used in section 12 of article XI of the state constitution, and if they may be deemed to be taxes imposed by the legislature, they are not taxes imposed "for county, city, town or other municipal purposes" and, therefore, said act does not violate the inhibition of said section of the constitution, which provides that the legislature shall have no power to impose taxes upon counties, cities, towns, or other public or municipal corporations, or upon the inhabitants or property thereof, "for county, city, town or other municipal purposes."

[6] ID. — INAUGURATION OF PROCEEDINGS — EXCLUSIVE JURISDICTION — SPECIAL COMMISSION—CONSTITUTIONAL LAW.—The City Boundary Line Act (Stats. 1911, p. 1018), in providing that the city, town, or county which inaugurates the proceeding by passing the necessary resolution of intention exercises the exclusive jurisdiction which is conferred upon it by said act and accepts a mandate to perform work in another municipal corporation and to levy special assessments upon property situated in such other municipal corporation, does not violate section 13 of article XI of the state constitution, which provides that the legislature shall not delegate "to any special commission . . . any power to make, control, appropriate, supervise or in any way interfere with any county, city, town or municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or assessments or perform any municipal function whatever."

[7] ID.—EXCLUSIVE JURISDICTION—LEGISLATIVE FUNCTIONS—TAXATION WITHOUT REPRESENTATION.—The City Boundary Line Act (Stats. 1911, p. 1018), by providing that the municipal corporation which inaugurates the proceeding is given exclusive jurisdiction thereof, does not violate the principle that there shall be no taxation without representation, as, in the first place, under said act the property owners affected are given notice of the contemplated improvement

5.  See 19 R. C. L. 946; 18 Cal. Jur. 805.
7.  See 19 R. C. L. 944; 18 Cal. Jur. 791.

and are afforded an opportunity to have their objections heard and considered, and, in the second place, every property owner whose property is to be assessed under said act is duly represented through his local legislative body, and, under said act, every purely legislative power essential to the imposition of the assessment is exercised by the proper legislative body.

[8] ID.—"MUNICIPALITY" AND "MUNICIPAL CORPORATION"—CONSTRUCTION OF TERMS—LEGISLATIVE INTENT.—Whenever it appears that the legislature so intended, the terms "municipality" and "municipal corporation" will be construed to include a county or other *quasi-*municipal corporation.

[9] ID. — CITY BOUNDARY LINE ACT — CONSTITUTIONALITY OF TITLE — SUBJECTS EMBRACED.—The words in the title of the City Boundary Line Act (Stats. 1911, p. 1018), as amended in 1923, which declare that the act is to provide, among other things, "for a system of local improvement bonds to represent the assessments for such costs and expenses and for the payment and effect of such bonds," fully and completely embrace the subject of local improvement bonds to represent assessments upon any of the lands which the act authorizes to be assessed, and the title of said act, therefore, meets all the requirements of section 24 of article IV of the state constitution.

[10] ID.—REFERENCE TO STREET IMPROVEMENT BOND ACT—AUTHORITY TO ISSUE BONDS.—By its reference to the Street Improvement Bond Act of 1893, the City Boundary Line Act adopts the machinery of said bond act; and when bonds are issued under the City Boundary Line Act they issue, not by virtue of the City Street Improvement Bond Act, but in virtue of its own provisions.

[11] ID.—LEGISLATION BY REFERENCE TO EARLIER ACT—PROVISIONS INCORPORATED.—The legislature may extend the provisions of an existing statute to a new subject by an appropriate reference to such statute in the new act, only those provisions of the extended act being incorporated in the new one which are appropriate to the new subject.

[12] ID. — INCORPORATION BY REFERENCE TO TITLE — EARLIER ACT NOT AMENDED.—There is no constitutional objection to the incorporation of an earlier act into a later act, by reference to the title of

---

8.  County as municipal corporation, note, **Ann. Cas.** 1914C, 968.

9.  Construction of constitutional provisions relative to titles of statutes, notes, 1 Ann. Cas. 584; Ann. Cas. 1915A, 79.

Insufficiency of title as affecting validity of act, note, **Ann. Cas.** 1916D, 28. See, also, 25 R. C. L. 847.

11. See 25 R. C. L. 873.

such earlier act; and such mode of legislation has not the effect of amending the earlier act by reference to its title, in violation of section 24 of article IV of the state constitution.

(1) 28 Cyc., p. 304 (Anno.). (2) 28 Cyc., p. 304 (Anno.). (3) 28 Cyc., p. 304 (Anno.). (4) 28 Cyc., p. 304 (Anno.). (5) 28 Cyc., p. 1660 (Anno.). (6) 28 Cyc., p. 278 (Anno.). (7) 28 Cyc., p. 1661 (Anno.). (8) 28 Cyc., p. 118. (9) 36 Cyc., p. 1037. (10) 28 Cyc., p. 1576 (Anno.). (11) 36 Cyc., p. 1152. (12) 36 Cyc., p. 1064.

PROCEEDING in Mandamus to compel the Board of Public Works of the City of Los Angeles to execute a contract awarded to petitioner under the City Boundary Line Act. Peremptory writ issued.

The facts are stated in the opinion of the court.

Heller, Ehrman, White & McAuliffe, James L. Atteridge and Charles W. Cobb for Petitioner.

Wilbur Finch for Respondents.

FINLAYSON, P. J.—This is an original proceeding in this court for a writ of *mandamus* to compel respondents, as members of the board of public works of the city of Los Angeles, to execute a contract which the city council has awarded to petitioner under the act commonly known as the "City Boundary Line Act." The points to be considered involve only the constitutionality of that act.

The City Boundary Line Act was adopted in 1911 (Stats. 1911, p. 1018). In 1923 the legislature amended both the act and its title. As thus amended, the title now reads: "An act to provide for the establishment and change of grade of public streets, avenues, lanes, alleys, courts, places and rights of way forming the exterior boundaries of any municipality, whether partly or wholly within or without said boundaries, or extending into the territory of two or more municipalities, or extending into the territory of one or more municipalities and unincorporated territory, and providing for work upon and the improvement thereof, and providing for the construction of sanitary and storm sewers, drains and drainage systems, together with any and all appurtenances and appurtenant work in connection with any of such work or improvements; to assess the whole or any

portion of the cost and expenses thereof upon private property, and to provide for a system of local improvement bonds to represent the assessments for such costs and expenses and for the payment and effect of such bonds." (Stats. 1923, p. 633.)

It will be sufficient for our purposes to state the general features of the statute without going into detail. The act declares that its provisions shall apply to and authorize the improvement of any street which extends along the boundary line between two municipalities, or which extends along the boundary line of any municipality and unincorporated territory in the county, or which extends from or through one or more municipalities into or through unincorporated territory. Whenever the public interest and convenience may require, and whenever the city council or other legislative body of each of the municipalities and the board of supervisors of the county, having jurisdiction over any portion of the territory proposed to be included in an assessment district to be formed under the act, shall consent to the formation of such assessment district and to the commencement of a proceeding for the construction of the improvement, the city council of such consenting municipalities and the board of supervisors of such consenting county are authorized and empowered to do any of the work provided for by the act. This work includes the construction of sanitary sewers, storm sewers, drains, and drainage systems for sanitary or drainage purposes in or along the streets which form or cross the exterior boundary or boundaries of such municipalities, or which extend into or through the territory of two or more of the municipalities, or which extend into or through one or more of the municipalities and unincorporated territory in the county. It is declared that the city council in each municipality and the board of supervisors of the county in which such municipalities are situated shall have concurrent jurisdiction of all proceedings under the act, provided that the city council or the board of supervisors which is first to pass a resolution of intention to do the work shall thereafter have exclusive jurisdiction of the work and of all proceedings covered by the resolution of intention.

Speaking generally, it may be affirmed that, from the passage of the resolution of intention to the time when the

assessment liens attach, proceedings under this act are, in the main, analogous to those which are prescribed by the several street work acts now on the statute books and which authorize street work to be done wholly within the corporate limits of a single city or town, such, for example, as the Vrooman Act, the principal differences consisting of those additional or modifying features which are made necessary by the fact that the improvements authorized by this act are to be made on or in streets which form the boundary or boundaries between two or more municipalities or between a municipality and unincorporated territory, or which extend from or through one or more municipalities into or through unincorporated territory. The property chargeable with the cost of the work is to be assessed according to the front-foot plan of assessment, unless the council or the board which passes the resolution of intention, being of the opinion that the contemplated work is of more than local or ordinary public benefit, shall make the expense chargeable upon a district specially benefited by the improvement, in which case the district shall be described in the resolution of intention.

Section 37 (added by the act of 1923—Stats. 1923, p. 637) provides for the issuance of improvement bonds to represent the assessments. It is declared in this section that if the resolution of intention authorizes the issuance of such bonds, whether in incorporated or unincorporated territory, they "shall be issued under the provisions of an act of the legislature of the State of California entitled 'An act to provide a system of street improvement bonds to represent certain assessments for the cost of street work and improvements within municipalities, and also for the payment of such bonds,' approved February 27, 1893, and all acts amendatory thereof or supplementary thereto; and said act and amendments thereto are hereby incorporated in and adopted as a part of this act."

The city of Los Angeles is organized under a freeholders' charter. The city council of that city, with the express consent of the board of supervisors of the county, evidenced by a resolution adopted by the latter body, passed a resolution of intention whereby it inaugurated proceedings under the City Boundary Line Act for the construction of a storm sewer system, known as the "Main Street Storm Sewer

System," consisting of about twenty-eight miles of storm sewers extending into unincorporated territory of the county and lying partly within and partly without the city of Los Angeles. The city council was of the opinion that the improvement was of more than local or ordinary public benefit, and therefore resolved to make the expense chargeable upon an assessment district which is described in the resolution of intention and is declared to be the district which will be benefited by the work. The resolution also declares that serial bonds shall be issued to represent assessments of twenty-five dollars or more, and that they shall be issued in accordance with the provisions of the Street Improvement Bond Act of February 27, 1893.

It is conceded that the purpose of the contemplated storm sewer system is to remedy a condition which has resulted in a serious inconvenience to the residents of, and in the substantial destruction of property in, the entire improvement district described in the resolution of intention. All proceedings up to and including the award of the contract seem to have been regularly had and taken pursuant to the requirements of the statute; but respondents, deeming the act unconstitutional, have refused to execute the contract, notwithstanding its award to petitioner by the city council. We shall consider the objections to the act in the order in which they are presented in respondents' brief.

[1] 1. It is contended that in so far as it affects the city of Los Angeles the act violates section 6 of article XI of the state constitution, which makes city charters paramount to general laws with respect to "municipal affairs." It is claimed that the construction of so much of the proposed sewer system as lies within the city's corporate limits is a "municipal affair" which has been definitely committed to the city by its charter.

It is true that the charter of the city of Los Angeles contains an express grant of power to make street improvements and to provide that the costs and expenses thereof shall be a lien upon the abutting property or on property in districts benefited thereby. But it also is expressly declared in that instrument that these powers shall be "supplemental, additional and alternative powers to those conferred upon municipalities by the general laws of the state

69 Cal. App.—23

of California.'' (Subds. 13 and 19 of sec. 2, art. I, of the Charter; Stats. 1919, pp. 1432, 1433; Stats. 1921, pp. 1802–1804.) By thus declaring that the powers granted by the charter with respect to street improvements are ''supplemental, additional and alternative'' to such powers as may likewise be conferred upon municipalities by general laws, there is evidenced an unmistakable intention on the part of the charter-makers to confer upon the city authorities the right to elect either to exercise the powers which are expressly granted to the city by its organic law, and to proceed as therein provided, or to exercise those powers which are granted to all the municipalities of the state by general laws, and to proceed as in those laws prescribed. In the instant case the city council elected to exercise the powers which are granted generally to municipalities by the act in question. In the resolution of intention it is expressly declared that the proceedings for the construction of the proposed sewer system shall be had and taken under the City Boundary Line Act. This was tantamount to the adoption of all the provisions of that act, and was clearly authorized by law. (*Cole* v. *City of Los Angeles*, 180 Cal. 617 [182 Pac. 436]; *Cutting* v. *Vaughn*, 182 Cal. 151 [187 Pac. 19].) In *Cole* v. *City of Los Angeles, supra,* the court, on page 624, says: ''If the legislative body of the city of Los Angeles is supreme in municipal affairs by virtue of the constitutional and charter provisions above referred to, and if without affirmative action on the part of the legislative authority of the city no general law with relation to municipal affairs has any binding effect therein, it is nevertheless true that the legislative body of the city has power to adopt any state law applicable to its municipal affairs, and that in the matter of the issuance of these bonds that was effectually done by the ordinances and proceedings above referred to.''

[2] There is, however, another and more fundamental reason why the city of Los Angeles should be held to possess the powers which are granted by the City Boundary Line Act. A basic error in respondents' position, and one which underlies and vitiates the arguments presented by them in support of almost all of their points, lies in their assumption that the improvements authorized by this act were ''municipal affairs.'' It is true the improvements are local, but it is equally true that every operation authorized by the

act presents an extra-municipal scheme of improvement—
that the work is of a public, as distinguished from a purely
municipal, character, and that though the improvement is
local it is of such a character that the state is interested
in it.

It would be as rash as it certainly would be unwise to at-
tempt any general, comprehensive definition of the term "mu-
nicipal affairs," as used in our constitution.  Such a defini-
tion, if it shall ever become practicable, must be a matter for
the future—the result of a gradual and progressive process
of judicial exclusion and inclusion.  This much, however,
we think may be safely predicated: An improvement may
not be said to be a "municipal affair," within the meaning
of the constitution, if it is not of *special* concern to the in-
habitants of, or to the owners of property in, the particular
city or town, or to the inhabitants of, or owners of prop-
erty in, some portion of such city or town, simply as such
inhabitants or property owners.  If it is of general concern
to the inhabitants and property owners of a city or town,
or of a portion of a city or town, in common with inhabi-
tants or property owners of the state at large, or of a portion
of the state outside of such city or town, it is not a purely
"municipal affair," as those words are used by our or-
ganic law.

[3]  By the act in question, and under its sanctions, a
county and one or more cities or towns may unite for the
common benefit of all the interested inhabitants or property
owners within the improvement district for the purpose of
effecting an improvement which does not lie wholly within
any one city or town and which does not concern alone or
especially the inhabitants or property owners of any one city
or town.  In this way there may be accomplished what it
would be impossible for any one of the municipal agencies
jointly engaged in the common enterprise alone to achieve.
For the purpose of paying the expense of such an improve-
ment an assessment district may be formed which, like the
improvement itself, lies partly within and partly without
each of the constituent municipal units jointly engaged in
the common undertaking.  For these reasons the improve-
ment, while in a certain sense partaking of the characteris-
tics of a municipal affair, in that municipalities are interested
therein, is essentially much more than a municipal affair.

It is not uncommon to find, contiguous to an incorporated city or town, a large section of unincorporated territory so densely settled and built upon that the eye can distinguish no difference between the physical conditions obtaining on either side of the invisible boundary line which separates the city or town from the outside territory. If a city or town which borders upon such densely settled unincorporated territory were to pave or otherwise improve one of its streets to the boundary line, and if, when completed, the improved city street connected with an unimproved, rough, uneven dirt road extending through the adjacent populous unincorporated district, would not the inhabitants of the city and the owners of property therein, as well as the inhabitants of and owners of property in the adjacent populous sector, be greatly benefited if the connecting dirt highway were also improved to correspond with the improved street within the city? It is manifest that in such a case the inhabitants and property owners in that larger district which embraces both the city and the contiguous unincorporated territory would be interested in having the city street and connecting highway improved at the same time, as one undertaking, under a single comprehensive scheme of improvement. Not only would the inhabitants of the whole district, as users of the highway, have a common interest in having the highway improved in its whole extent throughout the entire district— the portion within the incorporated city as well as the outside portion which lies in the unincorporated territory—but the property owners within the district, as persons whose lands are liable for the expense of the improvement, would also have a common interest in having the work done as a single comprehensive scheme. For the work could doubtless be done at less expense per linear foot, other things being equal, if it were done as a unit by one contractor, under a single contract.

What we have just said respecting the community of interest which the inhabitants and property owners of the city possess in common with the inhabitants and property owners of contiguous unincorporated territory in the construction or improvement of a through highway as a single enterprise applies with even greater force to the community of interest possessed by such inhabitants and property owners in the

construction of a common storm-sewer system to take care of their collective storm waters—waters which, in the absence of a common storm-sewer system, might collect in times of great rainfall and inundate and possibly damage all of the neighboring lands. If, for example, the city should construct a storm-sewer system within its corporate limits but none should be constructed in the contiguous unincorporated territory, might it not be that, due to the peculiar topography of the land at or near the boundary between the incorporated and the unincorporated territory, the lots in the vicinity of the boundary line and on either side thereof would be flooded in the winter season, notwithstanding the city's storm-sewer system? In the same way we can readily imagine a case where it would be equally vital that there should be a common sanitary sewer system, serving the lands on either side of the invisible boundary line. If the city should construct a sanitary sewer system and none should be constructed in the thickly settled community occupying the contiguous unincorporated territory, it is more than likely that there would be unsanitary conditions, threatening the health and welfare of the near-by city dwellers as well as those living just outside of the city, in spite of the city's enterprise.

These considerations can lead to but one conclusion: The improvement of the streets of a city or town, and matters of sanitation or of storm-water protection therein, are municipal affairs when the special benefits derived therefrom are limited to the inhabitants or property owners of such city or town. But in many instances street improvements, including sanitary and storm-water sewers, may and do become affairs of a broader scope which cannot be handled adequately by the municipal authorities of a single city or town for the reason that they directly and peculiarly affect the inhabitants and property owners of two or more cities or towns, or of one or more cities or towns and outside unincorporated territory, and they do so in such a way that the purposes sought to be accomplished by the improvement can be effected only by a single, comprehensive scheme of construction, all the parts of which are so related to one another that the omission of any one part would necessarily impair or destroy the usefulness of the remainder. In such cases

the improvement, jointly undertaken for the common benefit
of all, is not a "municipal affair," as that term is used in
our constitution. Such is the nature of the improvements
which are authorized by the City Boundary Line Act. They
are intended to benefit and advantageously serve territory
which does not lie wholly within any one city or town, and
they are of such a character that they cannot be adequately
handled by the municipal authorities of any single city or
town. [4] It follows, therefore, that the improvements au-
thorized by this act are not "municipal affairs," and that
the act does no violence to the rights reserved to chartered
municipalities by section 6 of article XI of the state consti-
tution. This conclusion is sustained by the following au-
thorities, which, if not directly in point, are applicable in
principle: *Pixley* v. *Saunders,* 168 Cal. 152 [141 Pac. 815];
*Pasadena Park Improvement Co.* v. *Lelande,* 175 Cal. 511
[166 Pac. 341]; *Henshaw* v. *Foster,* 176 Cal. 507 [169 Pac.
82]; *Van de Water* v. *Pridham,* 33 Cal. App. 252 [164 Pac.
1136].

In *Pixley* v. *Saunders, supra,* the court, holding that the
inclusion of a subsequently incorporated town within a
sanitary district created under the Sanitary District Act of
March 31, 1891, did not relieve the land within the town
from taxes levied by the district, said: " . . . while gen-
erally the question of sanitation is a municipal affair, in
many instances it is one of broader scope, which cannot be
adequately handled by the municipalities of a single town."
In *Pasadena Park Improvement Co.* v. *Lelande, supra,* the
court expressed itself as follows: " . . . cases may arise
where the matter is not simply and without complication a
municipal affair, but where, partaking of the characteristics
of a municipal affair, in that the municipality is interested
therein, it may essentially be much more than merely a
municipal affair. . . . Thus it is quite apparent that a mu-
nicipality, and a municipality alone, may be injuriously
affected by the unrestrained floods of some innavigable
stream. Upon the other hand, the injurious effects may
reach far beyond the boundaries of the municipality and
even of the county, and in the latter class of cases it is more
than a municipal affair. It is an affair in which the state

becomes interested, and it does no violence to the reserved rights of municipalities to say that in such cases the state directly or through its mandataries may take steps to correct the evil, and in so doing compel lands within municipalities to bear their due proportion of the burden." In *Van de Water* v. *Pridham, supra,* the court used this language: " . . . the construction of a drainage system for the purpose of draining swamp and overflowed lands adjacent to Long Beach, although the drainage ditches extend through the streets of such city, cannot be deemed a municipal affair. Since the conditions existing, as where the lands are outside the city limits, or inclusive of lands both in and outside thereof, it becomes a matter of more than local concern."

In at least two of the cases last cited the work and the proceeding for its accomplishment were undertaken by a corporate or political entity separate and distinct from either the city or the county. Thus in *Pixley* v. *Saunders, supra,* the work was done and the tax levied by a sanitary district created under the Sanitary District Act of March 31, 1891. But under the act here in question, as in the statutes under review in *Pasadena Park Improvement Co.* v. *Lelande, supra,* and *Anaheim Sugar Co.* v. *County of Orange,* 181 Cal. 212 [183 Pac. 809], neither the district to be assessed nor the territory to be improved has any separate or distinct corporate existence *de jure* or *de facto.* Under this act the city or the county which inaugurates the proceeding by passing the necessary resolution of intention becomes the state's mandatary to let the contract, to supervise the performance of the work and to conduct all the proceedings. Nor can we see any reason why the legislature may not give such a mandate to the city or the county which is the first to pass the resolution of intention, although it is claimed by respondents that the city or county which exercises the mandate becomes a "special commission," within the meaning of section 13 of article XI of the constitution, and that, therefore, the act violates that section of the state's organic law. But as this presents the question which is argued by respondents as their third point, we shall defer its consideration until we reach it in its order.

[5] 2. As their second objection to this statute, respondents claim that it violates section 12 of article XI of the consti-

tution, which reads: "The legislature shall have no power to impose taxes upon counties, cities, towns or other public or municipal corporations, or upon the inhabitants or property thereof, *for county, city, town or other municipal purposes* [italics ours], but may, by general laws, vest in the corporate authorities thereof the power to assess and collect taxes for such purposes." This objection receives its quietus from what we said when considering respondents' first point, even assuming that the "taxes" referred to in this constitutional inhibition include special assessments for local improvements, and that assessments levied under this act are *imposed* by the legislature, notwithstanding they are the result of the voluntary action of the municipalities in which the assessed lands are situated. That is to say, even if the assessments which this act authorizes may be deemed to be taxes, as that word is used in this constitutional inhibition, and if they may be deemed to be taxes imposed by the legislature, still they are not taxes imposed "for county, city, town or other municipal purposes." As we have shown, the improvements authorized by this statute are broader in their scope than any purely city or town purpose; and equally true is it that they transcend any purely county purpose, for whenever they include the unincorporated territory of any county they must also include the incorporated territory of some city or town within the county.

[6] 3. Respondents' third objection is that the act violates section 13 of article XI of the constitution. That section reads, in part, as follows: "The legislature shall not delegate to any special commission, private corporation, company, association or individual any power to make, control, appropriate, supervise or in any way interfere with any county, city, town or municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or assessments or perform any municipal function whatever." It has recently been decided that a municipal corporation, whether a city or a county, is not embraced within any of the classes enumerated in this section of the constitution. That is, it has been decided that a municipal corporation is not a "special commission," "private corporation," "company," "association" or "individual," within the meaning of those words as used in this consti-

tutional inhibition. (*City of Oakland* v. *Garrison,* 194 Cal. 298 [228 Pac. 433].)

But, say respondents, when a city, town, or county, having inaugurated the proceeding by passing the necessary resolution of intention, exercises the exclusive jurisdiction which is conferred upon it by the city boundary line act and accepts a mandate to perform work in another municipal corporation and to levy special · assessments upon property situated in such other municipal corporation, the city, county, or town so accepting such mandate becomes a "special commission" within the meaning of section 13 of article XI, and as such special commission it makes a municipal improvement in, and levies taxes and performs municipal functions for, such other municipal corporation. Respondents' position would be unanswerable if it were true that the city, town, or county upon which the act confers the mandate to do the things of which it is given exclusive jurisdiction were engaged in the supervision of a municipal improvement or in the performance of a strictly municipal function. The conditions which the City Boundary Line Act is designed to remedy extend beyond the boundaries of any one municipality. Where the evil to be remedied reaches beyond the boundaries and jurisdiction of any one municipality—whether such extra-municipal ill be due to an unimproved roadway extending into one or more other municipalities, or to unsanitary conditions due to the lack of a suitable regional sanitary sewer system, or to a widespread overflow of rain waters—a proceeding to correct the evil by a single comprehensive scheme of improvement on lands in an improvement district which embraces a portion of all of the municipalities affected by the evil conditions is, as we have shown, more than a mere municipal affair. In such cases the evil to be remedied is one in which the state is interested. In *Pasadena Park Improvement Co.* v. *Lelande, supra,* the court, speaking of an analogous situation, said: "It is an evil in which the state becomes interested, and it does no violence to the reserved rights of municipalities to say that in such cases the state directly or through its mandataries may take steps to correct the evil." In that case the county acted as a mandatary to do protection work on, and to levy assess-

ments upon, property which was partly within the corporate limits of the city of Pasadena.

[7]  4. It next is claimed that the act violates the principle that there shall be no taxation without representation. Because the municipal corporation which inaugurates the proceeding is given the exclusive jurisdiction thereof, it is said that the owners of the assessed lands which are located in the other municipalities affected by the proceeding are taxed by a body which is not elected by them and in which they have no representation. Without doubt it is a fundamental principle in republican government that the people who are to pay the taxes for the support of the government must vote thereon, either directly or by their legal representatives, state taxes being levied under laws passed by the state legislature and local taxes under the votes of the people concerned or their duly authorized officers or agents. (1 Cooley on Taxation, 4th ed., sec. 416.) It also may be conceded that when the courts are called upon to declare a statute unconstitutional it is not essential that there should be found in the organic law some specific inhibition which has been disregarded, or some express command which has been disobeyed. (*People* v. *Lynch,* 51 Cal. 26, [21 Am. Rep. 677] ; *Britton* v. *Board of Commrs.,* 129 Cal. 337 [51 L. R. A. 115, 61 Pac. 1115].) But we fail to perceive how this statute contravenes the principle that taxation and representation shall go together.

In the first place, while special assessments for local improvements are made in the exercise of the sovereign power of taxation, they are not levied or collected in the exercise of the general taxing power of the municipalities for the purpose of defraying the expense of the maintenance and administration of their governments. They are levied against the real property which is supposed to be specially benefited by the improvement, for the sole purpose of paying the cost and expense of the work, and they must be applied for that purpose and none other. Such an assessment does not create a personal obligation. It is but a charge against the property specially assessed. The lands assessed to pay the cost of an improvement may belong to very few of the voters of the municipality or district. Indeed, it is possible that all of the assessed lands in an improvement district may be

owned by nonresidents of the state. The theory of such
assessments is that certain real estate will be benefited by
the proposed improvement more than it will cost to make it,
and that, therefore, the real estate thus specially benefited
must bear the burden. It is the ownership in that real es-
tate—not the public merely, as such—that may be injuriously
affected by the assessment. But this ownership is, in fact,
better protected by this statute than it would be by a popu-
lar vote had for the purpose of directly authorizing the as-
sessment or of selecting officials authorized to levy it. The
statute requires, as a condition precedent to the formation
of the assessment district, that the property owners shall be
afforded an opportunity, after due notice, to file objections
to the proposed improvement and to the formation of the
proposed assessment district, and that they shall have their
objections heard and considered. There is also a provision
which secures to every aggrieved property owner the right
to question the correctness or legality of the assessment by
appealing to the legislative body which has jurisdiction of
the proceeding. These provisions of the statute afford the
property owners far more protection than would be derived
by them from the mere fact that the assessments were levied
by a body elected by the inhabitants of the entire assessment
district. (See *Owners of Lands* v. *People*, 113 Ill. 296; also,
*Little Rock* v. *Board of Improvements*, 42 Ark. 161 et seq.)

Moreover, the inhabitants of all municipalities within whose
bounds lands subject to assessment are situated were repre-
sented in the legislature by which the statute was enacted;
and since the improvement is more than merely a municipal
affair, it was competent for that legislature to provide for
the selection of any suitable agent to make it, and to pro-
vide for the assessment of the lands benefited without regard
to the boundaries of municipalities organized for govern-
mental purposes. (*In re Madera Irr. Dist.*, 92 Cal. 296
[27 Am. St. Rep. 106, 14 L. R. A. 755, 28 Pac. 272]; *Stuck-
enbruch* v. *Board of Supervisors*, 193 Cal. 506 [225 Pac.
857]; *Pasadena Park Improvement Co.* v. *Lelande, supra;
City of Indianapolis* v. *Bryan*, 188 Ind. 586 [125 N. E. 38];
*Brown* v. *Baltimore etc. R. Co.*, 186 Ind. 81 [115 N. E. 86];
*State ex rel. Bulkeley* v. *Williams*, 68 Conn. 131 [48 L. R. A.
465, 35 Atl. 24]; *Borrowdale* v. *Socorro County*, 23 N. M. 1

[L. R. A. 1917E, 456, 163 Pac. 721].) In *State ex rel. Bulkeley* v. *Williams, supra,* the court says: ''Taxes can, indeed, under our system of government, only be imposed by the free consent of those who pay them, or their representatives, and for purposes which they approve. But the inhabitants of these towns were represented in the general assembly by which the laws now brought in question were enacted.''

But, beyond all this, the fact remains that every property owner whose property is assessed under the provisions of this act is duly represented through one of the local legislative bodies consenting to the improvement. In this connection it is well to remember that in order to satisfy the principle that the persons who pay the taxes are entitled to have a voice in the election of those who impose them, it is not necessary that the taxpayer should be an elector of the taxing district. As practically administered, the maxim that taxation and representation go together does not mean that no person—man, woman, or child, resident or nonresident—shall be taxed unless he is represented by someone for whom he had actually voted. The maxim is only true when understood in a territorial sense. (1 Cooley on Taxation, 4th ed., sec. 21.)

When the principle is applied to special assessments for local improvements, it is satisfied if every purely legislative power essential to the imposition of the assessment is exercised by the proper legislative body. This is so far the reason that the principle is applicable only to the exercise of such powers as are essentially legislative. It has no application to any power which properly may be performed by or be delegated to executive or ministerial officers. If, therefore, the act in question enables the legislative body of each of the municipalities engaged in the common enterprise to exercise all of the legislative power which is involved in the imposition of a valid local assessment, then it may confidently be affirmed that the statute fully vindicates the principle that in free governments the representatives of the people must impose the taxes which the people are to pay.

Every system of taxation consists of two parts: (1) the elements which enter into the imposition of the tax, and (2)

the steps taken for its assessment and collection. The former is a legislative function; the latter is mere machinery, and is delegable to other than governmental agencies. (1 Cooley on Taxation, 4th ed., sec. 78.) The legislative powers include the selection of the property to be taxed, the determination of the basis for the measurement of the tax, and the definition of the purpose for which the tax shall be levied. (Id.) On the other hand, powers which are not legislative include the power to value property for taxation pursuant to fixed rules, the power to extend, assess, and collect the taxes, and the power to perform any of the innumerable details of computation, appraisement, and adjustment. (Id.) "It may be laid down as a general proposition," says the supreme court of the United States, "that where a legislature enacts a specific rule for fixing a rate of taxation, by which rule the rate is mathematically deduced from facts and events occurring within the year and created without reference to the matter of that rate, there is no abdication of the legislative function, but, on the contrary, a direct legislative determination of the rate." (*Michigan Cent. R. Co.* v. *Powers*, 201 U. S. 245, 297 [50 L. Ed. 744, 26 Sup. Ct. Rep. 459, see, also, Rose's U. S. Notes].)

If, now, we apply these principles to assessments levied under the statute here in question, it will be seen that the act provides for the exercise of every purely legislative function by the proper legislative body. It will be recalled that, by the express terms of the act, no work can be done or assessments levied until the legislative body of each of the municipalities having jurisdiction over any territory proposed to be assessed shall have given its consent: (1) to the formation of the assessment district, and (2) to the commencement of a proceeding for the construction of the improvement definitely described in the resolution of intention. In this way the legislative body of each municipality having jurisdiction over any part of the territory to be assessed passes upon every purely legislative question which is involved in the imposition of assessments upon lands within its jurisdiction.

The passing of judgment upon those factors which enter into and necessarily determine the total amount to be as-

sessed against the lands in the assessment district is a legislative function. The total amount to be assessed upon the district depends upon the cost of the work. But the cost of the work is practically determined when the legislative bodies which consent to the performance of the common undertaking have agreed upon the precise nature and extent of the proposed improvement and it has been described in the resolution of intention. This is so for the reason that the statute provides that the contract shall be let only to the lowest responsible bidder. So that, when the precise nature and extent of the proposed improvement has been passed upon and determined by the legislative bodies of the municipalities engaged in the common enterprise, every purely legislative function which is determinative of the cost of the work, and of the consequent total amount to be assessed, has been exercised, and has been exercised by legislative bodies which together represent the owners of all of the assessed properties.

Given the cost of the improvement, and the amount of each assessment, if the work is to be paid for by the front-foot method, is a mere matter of detail, involving only arithmetical calculations which may be delegated to any administrative agency. If a special assessment district is to be created, the elements which enter into and affect the amount of each assessment are: (1) the total cost of the improvement, and (2) the extent and description of the assessment district. Given these two factors, and the rest is a mere matter of estimating the proportional benefit received by each lot and making the necessary arithmetical calculations—matters which may be delegated to any appropriate administrative agency.

From these considerations it follows that where the front-foot mode of assessment is adopted the only essential matters necessary to be passed upon by the local legislative body which represents the taxpayers of any part of the district are: (1) the nature of the proposed improvement, and (2) that it shall be made. And where the cost is to be spread over a specially benefited assessment district the only elements essential to the complete exercise of all of the legislative power involved in the imposition of the assessments

are: (1) the nature of the proposed improvement; (2) that it shall be made, and (3) the extent of the assessment district.   With these factors established, the amount which thereafter shall be assessed against each lot is a mere matter of administrative detail which does not involve the imposition of the assessment or require the exercise of the legislative function.   Because these factors—the only factors which involve the exercise of purely legislative power—are required to be passed upon and determined by the legislative bodies of all of the municipalities—including the county—which, collectively, have jurisdiction over the territory proposed to be assessed, it follows that there is no ground for the claim that the act violates the principle that in free governments taxation and representation are indissolubly connected.

5. Finally, it is urged that the part of the act which authorizes the issuance of local improvement bonds is unconstitutional and that, therefore, the proceeding here under investigation, in so far at least as it authorizes the issuance of such bonds, is void.   It will be recalled that the section which relates to bonds (sec. 37) adopts the provisions of the Street Improvement Bond Act of 1893.   This it does by declaring that "said bonds shall be issued under the provisions of an act of the legislature of the State of California, entitled 'An act to provide a system of street improvement bonds to represent certain assessments for the cost of street work and improvements *within municipalities,* and also for the payment of such bonds,' approved February 27, 1893,'' and that "said act and the amendments thereto are hereby incorporated in and adopted as a part of this act."   (Stats. 1923, p. 637.)   (Italics ours.)

To support their contention that the bond features of the City Boundary Line Act are unconstitutional, respondents argue substantially as follows: The title of the Street Improvement Bond Act of 1893 limits its operation to the issuance of bonds to represent the cost of street work "within municipalities"; the word "municipalities" includes cities and towns, but not counties; therefore that act can have no operation in territory extending into the unincorporated limits of the county; hence, say respondents, any attempt to apply the provisions of the act of 1893 to lands which are beyond the scope of its title would violate section 24 of

article IV of our state constitution, which declares that "every act shall embrace but one subject, which subject shall be expressed in its title."

We are by no means convinced that the title of the Street Improvement Bond Act of 1893 limits its operation to cities and towns. The word "municipality" is often used as a synonym of the term "municipal corporation." (28 Cyc., p. 118.) [8] Whenever it appears that the legislature so intended, the terms "municipality" and "municipal corporation" will be construed to include a county or other *quasi*-municipal corporation. (28 Cyc., p. 118; *Merchants Bank* v. *Escondido Irr. Dist.*, 144 Cal. 329 [77 Pac. 937]; *Union Stone Co.* v. *Board of Freeholders*, 71 N. J. Eq. 657 [65 Atl. 466].) That the legislature, since 1913 at least, intended that the word "municipalities," as used in the title to the Street Improvement Bond Act of 1893, should be employed in its larger sense, so as to include counties as well as cities and towns, is made manifest by the fact that in a new section, added to the act in 1913 (Stats. 1913, p. 351), it is expressly declared that the work provided for by the Street Improvement Bond Act may be performed in "unincorporated territory of counties," and that wherever the words "municipality," "municipalities," or "city" appear in the act, "they shall be and are hereby defined as including cities, cities and counties and counties, and are hereby expressly declared to be interchangeable with any or either of those terms."

But regardless of whether the Street Improvement Bond Act of 1893 was or was not limited by its title to the issuance of bonds to represent assessments for work done in the incorporated territory of cities and towns, the machinery which that act provides for the issuance of bonds was adopted by the City Boundary Line Act for all of the purposes of the latter act—including the issuance of bonds to represent assessments on lands in the unincorporated territory of a county.

[9] The title to the City Boundary Line Act, as amended in 1923, declares that the act is to provide, among other things, "for a system of local improvement bonds to represent the assessments for such costs and expenses and for the payment and effect of such bonds." These words in the title

to that act fully and completely embrace the subject of local improvement bonds to represent assessments upon any of the lands which the act authorizes to be assessed, and its title, therefore, meets all the requirements of section 24 of article IV of the constitution. [10] By its reference to the act of 1893 it adopts, as we have said, the machinery of the Street Improvement Bond Act. When bonds are issued under the City Boundary Line Act they issue, not by virtue of the Street Improvement Bond Act, but in virtue of its own provisions. [11] It is well established that the legislature may extend the provisions of an existing statute to a new subject by an appropriate reference to such statute in the new act, only those provisions of the extended act being incorporated into the new one which are appropriate to the new subject. (*State* v. *Board of Commrs.*, 83 Kan. 199 [110 Pac. 92].)

[12] But, say respondents, if it be held that the City Boundary Line Act, by its reference to the Street Improvement Bond Act of 1893, incorporates into itself the machinery of the latter act for the issuance of bonds, then the effect is that the act of 1893 is "amended" by reference to its title, in violation of that provision in section 24 of article IV of the constitution which declares that "no law shall be revised or amended by reference to its title; but in such case the act revised or section amended shall be re-enacted and published at length as revised or amended." The vice of this argument lies in its assumption that by adopting the provisions of the Street Improvement Bond Act the City Boundary Line Act amended the former. The earlier act was neither revised nor amended by the later act. Every one of the provisions of the bond act of 1893, in force when the City Boundary Line Act became a law, remained in full force for the accomplishment of every purpose for which it was originally designed. The later act, by virtue of its own terms, merely extends the provisions of the earlier act to the issuance of bonds to represent assessments levied under the later act. By so doing, the later act simply incorporates into itself those provisions of the earlier act which are suitable to its purposes. (*State* v. *Board of Commrs., supra.*) There is in this state no constitutional objection to such mode of legislation. (*In re Burke,* 190 Cal. 326 [212 Pac. 193].)

We have carefully considered each of the objections to the City Boundary Line Act urged by respondents and find no merit in any of them.

Let the peremptory writ of mandate issue.

Works, J., and Craig, J., concurred.

A petition by respondents to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on December 22, 1924.

All the Justices concurred.